**2021 UT App 14**

## THE UTAH COURT OF APPEALS

EQUINE HOLDINGS LLC,
Appellant,
*v.*
AUBURN WOODS LLC, DENSONOCK LLC, DANIEL SIMMONS, AND
BLUE SKY RANCH HOMEOWNERS ASSOCIATION INC.,
Appellees.

Opinion
No. 20181022-CA
Filed February 11, 2021

Fourth District Court, Heber Department
The Honorable Jennifer A. Brown
No. 160500054

Deborah L. Bulkeley, Attorney for Appellant

Francis M. Wikstrom, Zack L. Winzeler, and Alan S.
Mouritsen, Attorneys for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGE
JILL M. POHLMAN and SENIOR JUDGE KATE APPLEBY concurred.[1]

HARRIS, Judge:

¶1     This case involves a dispute, between owners of lots in a three-lot subdivision, regarding the size of a special use area easement (Special Use Area) that burdens one of the lots. Equine Holdings LLC (Equine) appeals from the district court's ruling, on summary judgment, that the covenants, conditions, and restrictions (CC&Rs) that govern lots in the subdivision, as

---

1. Senior Judge Kate Appleby began work on this case as an active member of the Utah Court of Appeals. She completed her work as a senior judge sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

amended in 2006, were unambiguous, and described a Special Use Area much smaller than Equine envisioned. Based on its determination that the CC&Rs were unambiguous, the court refused to consider extrinsic evidence, proffered by Equine, which indicated that the smaller Special Use Area did not reflect the drafters' intent. We conclude that the CC&Rs are ambiguous, and therefore reverse the court's summary judgment order and remand for further proceedings.

BACKGROUND[2]

¶2      In the mid-2000s, an individual (Founder) owned (or controlled, through entities) approximately ninety acres of undeveloped real property, and wanted to divide that property into a "unique three-lot rural subdivision" designed to appeal to horse owners. In 2004, Founder named the subdivision the Blue Sky Ranch Subdivision (Subdivision), and recorded the first set of CC&Rs affecting the property (2004 CC&Rs). A plat map (2004 Plat) was attached to those original CC&Rs; the map depicted the manner in which the ninety acres were to be divided into three large lots, and indicated that Lot 2 was to be burdened by a "Special Use Area" easement "as defined in [the] CC&Rs." The Special Use Area, shown as a shaded area on the 2004 Plat, was depicted as a 320-foot-wide corridor that began at a highway on the eastern end of the Subdivision, and terminated on its western end in a straight north-south line; it did not extend into the wide western portion of Lot 2. But other than on the 2004 Plat, the 2004 CC&Rs did not use the term "Special Use

2. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Pipkin v. Acumen*, 2020 UT App 111, n.1, 472 P.3d 315 (quotation simplified).

Area." Instead, the 2004 CC&Rs appeared to refer to the shaded area on the 2004 Plat as a "[u]se [c]orridor," and described the corridor as a "perpetual non-exclusive easement" for the benefit of Lots 1 and 3 to be used for many purposes, including a "right to access" as well as the right to "walk, run, [or] ride horses."

¶3    An amended plat map for the Subdivision was independently recorded in August 2005 (2005 Plat); this new map showed that Lot 2 was still burdened by a Special Use Area easement, "as defined in [the] CC&Rs," but this time the shaded portion of the Subdivision depicted as the Special Use Area was much larger, extending into the wide western portion of Lot 2 and terminating on its western end not in a straight line but in a meandering line, defined by a creek. The 2005 Plat indicated that the new Special Use Area comprised 33.96 acres. No amendment to the CC&Rs was undertaken in connection with the 2005 amendment to the plat map.

¶4    In October 2005, soon after the 2005 Plat was recorded, Equine entered into an agreement to lease Lots 1 and 3 from an entity controlled by Founder, who at that time still owned or controlled (through various entities) all three lots. Since 2005, when it first leased Lot 1, Equine has continuously operated a horse pavilion on that lot, from which it "offers boarding, training, recreation and other horse related activities to its guests," as well as access to a trail system—located primarily on Lot 2—for its guests to ride their horses.

¶5    In March 2006, Founder amended the plat map again (March 2006 Plat), but this time he also amended the CC&Rs (March 2006 CC&Rs). The March 2006 Plat again depicted a shaded Special Use Area, "as defined in [the] CC&Rs," and, although the total acreage of the shaded Special Use Area was this time reduced to 26.63 acres, that area's western boundary was the same as on the 2005 Plat: a meandering line defined by a creek. In connection with this March 2006 amendment, the

CC&Rs were modified so that, for the first time, they defined the term "Special Use Area." The March 2006 CC&Rs did not include a legal description of the Special Use Area, but instead defined it as "that certain shaded area identified as" the Special Use Area on the March 2006 Plat. Like the 2004 CC&Rs, the March 2006 CC&Rs described the Special Use Area as a "perpetual non-exclusive easement" for the benefit of Lots 1 and 3, to be used for many purposes, including "the right to access" and the right to "walk, run, [or] ride horses."

¶6     Also in March 2006, the majority owner and managing member of Equine (Member) entered into a real estate purchase contract with Founder, on behalf of herself "and/or Assigns," tendering an offer to purchase Lots 1 and 3. During the ensuing negotiations and before closing, Member sought assurances from Founder that she and Equine would have access to the Provo River corridor, which borders the far western edge of Lot 2 but does not abut Lot 1 or Lot 3, and is outside the Special Use Area. To accommodate Member's request, Founder again amended the CC&Rs in June 2006 (June 2006 CC&Rs), and did so before closing on the sale of Lots 1 and 3 and while he still owned or controlled all three lots. The June 2006 CC&Rs indicated that the "[o]wner of Lot 2" grants to the owners of Lots 1 and 3 "a perpetual non-exclusive right of way and covenant running with, through and across Lot 2 for the purpose of accessing the Provo River corridor by any non-mechanical means, including pedestrian, horseback and bicycle." This Provo River access easement was different from, and not to be "considered a part of," the Special Use Area.

¶7     The June 2006 CC&Rs did not include a new plat map, and instead referenced the March 2006 Plat as the operative map. But although they did not purport to change the plat map itself, the June 2006 CC&Rs offered a new definition of the Special Use Area, this time utilizing a metes-and-bounds legal description. In

the June 2006 CC&Rs, the Special Use Area was described as a "perpetual non-exclusive use and access easement" for the benefit of Lots 1 and 3, to be used for "recreation, or any other legal use." And most significantly for present purposes, the June 2006 CC&Rs described the Special Use Area as "*a portion of* that shaded area" (emphasis added) on the March 2006 Plat that is "identified as" the Special Use Area, "which portion is legally described as follows:"

> An access road being three hundred and twenty (320) feet wide, BEGINNING at a point South 66°16′38″ West 1943.76 feet from the Northeast quarter corner of Section 19, Township 3 South, Range 5 East, Salt Lake Base & Meridian; thence South 62°28′44″ West 323.253 feet, thence North 55°44′31″ East 1203.403 feet; thence North 89°19′54″ West 447.286 feet; thence South 0° West 320 feet; thence South 89.19′54″ [sic] East 346.969 [feet]; thence South 55°44′31″ East 1298.26 feet; thence North 62°28′44″ East 514.69 feet; thence Noth [sic] 27°31′16″ West 320 feet to POINT OF BEGINNING.

Unbeknownst at the time to either Founder or Member, this legal description contains several errors, both major and minor. On the minor end of the spectrum, the description contains two errors in its fifth call (a decimal point instead of a degree symbol in the directional call, and the omission of the word "feet" after the distance call) and a typographical error in the eighth call ("Noth" instead of "North").

¶8      But in addition to these relatively minor errors, the description contains three other mistakes that are more significant. Specifically, the legal description: (1) uses as its starting reference "the Northeast quarter corner" of a section, a term the parties here agree is meaningless in the Public Land

Survey System; (2) states that the point of beginning is "a point South 66°16'38" West 1943.76 feet" from the aforementioned "Northeast quarter corner," a direction and distance that the parties agree is materially erroneous, because the true starting point was apparently meant to be "a point South 66°49'59" West, 1933.88 feet, from the Northeast corner"; and (3) uses the word "East" in its second directional call ("North 55°44'31" East 1203.403 feet") when—according to the parties—it was meant to say "West." Because of these errors, the legal description—when mapped according to its terms— depicts a non-existent parcel of property situated almost completely outside of the Subdivision, with boundaries that do not close.

¶9     Just days after the June 2006 CC&Rs were recorded, Member closed on the purchase of Lot 3, and Equine closed on the purchase of Lot 1. Over the next few years, Member, Equine, and Founder occupied their respective lots in relative peace. All parties appeared to share the understanding that the Special Use Area extended to the creek running through the wide western portion of Lot 2, and that Member and Equine (as the owners of Lots 1 and 3), as well as their invitees, had the right to use that area for recreational pursuits, including horseback riding. The Special Use Area—including specifically the part of it located in the wide western portion of Lot 2— contained many trails for walking and horseback riding, and Equine and Founder shared in both the cost and effort of maintaining those trails.

¶10    In 2012, Founder sold Lot 2 to Daniel Simmons and his wife, who were and are the owners and members of Auburn Woods LLC; Lot 2 was later conveyed to Auburn Woods. In 2014, Densonock LLC—another entity controlled by the Simmonses—acquired Lot 3. Thus, since 2014, Lots 2 and 3 have been controlled by the Simmons Parties (a term herein used to refer collectively to Auburn Woods, Densonock, and Daniel

Simmons[3]), and Lot 1 remains owned by Equine. Through 2016, Equine and the Simmons Parties occupied their respective lots in relative harmony, with Equine continuing to use, and share in the maintenance of, the entire Special Use Area as depicted on the March 2006 Plat, all the way to the creek on the west.

¶11     In 2016, after a survey of the Subdivision was conducted, the Simmons Parties took the position—apparently for the first time—that the western boundary of the Special Use Area did not extend all the way to the creek and that, instead, the Special Use Area looked something like the use corridor depicted on the 2004 Plat. Based on this understanding, the Simmons Parties informed Equine that Equine and its guests were no longer permitted to use the western portion—where most of the trails were located—of what it had previously considered the Special Use Area. Attached to this opinion as Appendix A is a comparative depiction of the Special Use Area as shown on the March 2006 Plat—the entirety of which Equine contends is the actual Special Use Area as intended by the drafters—and the smaller Special Use Area envisioned by the Simmons Parties.

¶12     Soon thereafter, Equine filed the instant lawsuit against the Simmons Parties, asserting claims for quiet title, declaratory judgment, reformation of the June 2006 CC&Rs, and injunctive relief. The Simmons Parties answered and filed counterclaims for quiet title, trespass, and declaratory and injunctive relief. Early in the litigation, the Simmons Parties moved for summary judgment on their quiet title and declaratory judgment counterclaims, asking for an order declaring that, under the June 2006 CC&Rs, the Special Use Area became a use corridor and did not include the disputed western portion. The district court issued an order denying this motion without prejudice, finding

---

3. Daniel Simmons's wife is not a party to this case, and therefore we do not include her in the collective term.

that a "document can . . . be ambiguous if it does not accurately describe the property at issue, as is the case here," and concluding that further discovery was needed.

¶13 After discovery, the Simmons Parties filed a renewed motion for summary judgment on their counterclaims for quiet title and declaratory relief, again seeking an order declaring that the Special Use Area did not include the disputed western portion, and asserting that the description of the Special Use Area in the June 2006 CC&Rs "is not ambiguous because its plain terms are susceptible of only one reasonable interpretation." In support of this argument, the Simmons Parties compared the boundaries of their claimed Special Use Area with the boundaries of Equine's claimed Special Use Area—neither of which matched the text of the legal description found in the June 2006 CC&Rs—and found that the two sides' shapes were identical over the eastern portion, and diverged only with regard to whether the Special Use Area contained the disputed western portion. Utilizing the assistance of an expert surveyor, the Simmons Parties pointed out that one of the calls in the legal description of the Special Use Area—"thence South 0° West 320 feet"—appeared to represent a north-south line that would fit with their claimed shape. And in addition to seeking summary judgment on their counterclaims for quiet title and declaratory relief, the Simmons Parties also sought summary judgment on Equine's reformation claim, asserting that it was barred by the applicable statute of limitations.

¶14 Equine opposed the Simmons Parties' motions, and also filed a motion seeking summary judgment in its favor on its own claims for quiet title and declaratory judgment. In connection with its motion, Equine sought an order declaring that the Special Use Area included the disputed western portion. In opposing the Simmons Parties' motions, Equine made two arguments. First, it asserted that the Special Use Area easement was created by plat and could be amended only by subsequent

plat, and that therefore the June 2006 CC&Rs could not alter the boundaries as a matter of law. Second, Equine asserted that the text of the June 2006 CC&Rs was ambiguous and that, in order to resolve the ambiguity, the court should consider extrinsic evidence of the drafters' intent. To support this position, Equine submitted sworn affidavits from Founder and Member, both averring that it was their intention, when the June 2006 CC&Rs were drafted, that the Special Use Area was to include the disputed western portion. According to Founder and Member, during their 2006 negotiations, they did not intend to change the boundaries of the Special Use Area, and intended that the boundaries stay the same as those depicted on the March 2006 Plat. Equine also pointed out that the legal description of the Special Use Area in the June 2006 CC&Rs contained several errors, as discussed *supra* ¶¶ 7–8, and set forth boundaries that failed to close. In the alternative, Equine asked the district court, in light of the extrinsic evidence it had submitted, to reform the June 2006 CC&Rs' description of the Special Use Area to conform to what the drafters intended.

¶15 After full briefing and oral argument, the district court granted the Simmons Parties' renewed motion for summary judgment on their counterclaims for quiet title and declaratory relief, and denied Equine's motion. The court concluded that the description of the Special Use Area found in the June 2006 CC&Rs was "not ambiguous because there is only one reasonable interpretation of the language": the one that comported with the Simmons Parties' understanding. Because it determined that the June 2006 CC&Rs were unambiguous, the court did not consider the extrinsic evidence Equine submitted. The court concluded that the unambiguous June 2006 CC&Rs establish "as a matter of law that the western boundary [of the Special Use Area] is a 320-foot north-south line connecting the admitted boundary lines." And given its ruling regarding interpretation of the June 2006 CC&Rs, the court declared "moot" the Simmons Parties' summary judgment motion on

Equine's reformation claim. Later, upon request from the Simmons Parties, the court entered an order, pursuant to rule 54(b) of the Utah Rules of Civil Procedure, certifying its summary judgment order as a final order.

## ISSUE AND STANDARD OF REVIEW

¶16 Equine now appeals from the district court's summary judgment order. Summary judgment is appropriate only "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, we ask "whether reasonable jurors, properly instructed, would be able to come to only one conclusion, or if they might come to different conclusions, thereby making summary judgment inappropriate." *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 20, 390 P.3d 314 (quotation simplified). "We review a [district] court's legal conclusions and ultimate grant or denial of summary judgment for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Heartwood Home Health & Hospice LLC v. Huber*, 2020 UT App 13, ¶ 11, 459 P.3d 1060 (quotation simplified).

## ANALYSIS

¶17 In challenging the district court's summary judgment order, Equine makes two arguments. First, it asserts that the Special Use Area easement was created by plat, and claims that, pursuant to certain statutes and county ordinances, such an easement can be modified only by amending that plat, and cannot be modified by amending the CC&Rs alone. Equine thus takes issue with the district court's determination "that it was not necessary to amend the plat in order to modify the extent of the easement" over the Special Use Area. Second, Equine asserts

that the court "erred in ruling that the legal description" of the Special Use Area in the June 2006 CC&Rs "was unambiguous and then reforming it without considering extrinsic evidence as to the parties' intent." We discuss each of Equine's arguments, in turn, rejecting the first argument but finding merit in the second.

I.

¶18　To be legally binding, an express easement must "be granted or declared by a writing" which both (1) "satisfies the statute of frauds," *Evans v. Board of County Comm'rs*, 2004 UT App 256, ¶ 9, 97 P.3d 697 (quotation simplified), and (2) indicates the parties' mutual assent "to be bound by its terms," *id.* ¶ 12 n.5 (quotation simplified). Aside from these basic principles, "there are no specific requirements for the creation of an express easement." *See Potter v. Chadaz*, 1999 UT App 95, ¶ 9, 977 P.2d 533; *accord Hart v. Schimmelpfennig*, 2009 UT App 27U, para. 3.

¶19　After an express easement is created by contract or other instrument, it may be modified by subsequent agreement of the same parties. Such modification can occur in several ways, including through methods provided in the original granting document or through other actions by one or both parties. *See* Restatement (Third) of Prop.: Servitudes § 7.1 (Am. Law Inst. 2000) (noting that a "servitude may be modified or terminated by agreement of the parties, by other methods spelled out in the document that creates the servitude, and by a variety of other methods," including abandonment, estoppel, or prescription).

¶20　Under certain circumstances, easements may also be created by plat. *See Oak Lane Homeowners Ass'n v. Griffin*, 2011 UT 25, ¶¶ 11, 13, 255 P.3d 677 (holding that "an easement by plat arises over either a public or a private road" when three conditions are met (quotation simplified)). Citing *Oak Lane*, Equine contends both (a) that the Special Use Area easement was created by plat, and (b) that easements created by plat may be

modified only by formally amending the plat pursuant to statutes and county ordinances.[4] We disagree with Equine's first premise, and therefore need not further discuss its second.

¶21   Easements, restrictive covenants, and other servitudes "that run with the land and encumber subdivision lots form a contract between subdivision property owners as a whole and individual lot owners; therefore, interpretation of the covenants is governed by the same rules of construction as those used to interpret contracts." *See Swenson v. Erickson*, 2000 UT 16, ¶ 11, 998 P.2d 807; *accord Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 19, 379 P.3d 1218. These principles apply to CC&Rs, "which are used in modern land development and play a valuable role in establishing and enforcing plans for the improvement and development of properties" such as the Subdivision. *See Shakespeare*, 2016 UT 28, ¶ 19. An easement created in a declaration of covenants, conditions and restrictions is thus an express easement, the terms of which are interpreted according to traditional rules of contractual construction.

---

4. Equine refers specifically to those sections of the Utah Code governing subdivisions for the purpose of county-managed land use regulation, *see* Utah Code Ann. §§ 17-27a-601 to -611 (LexisNexis 2017 & Supp. 2020), and, in particular, the sections listing the requirements and process for amending a subdivision plat, *see id.* §§ 17-27a-608 to -609. Equine also refers to county ordinances governing plat approval and amendment processes in the county where the Subdivision lies. *See* Wasatch County, Utah, Code §§ 16.02.06, .27.12 (2020). Equine asserts that the processes outlined in these statutes and ordinances were not followed, and any modification to the Special Use Area that did not go through the plat amendment processes described in these statutes and ordinances is legally invalid.

¶22  The Special Use Area easement in this case was created not by plat but by written agreement—the CC&Rs—between all the lot owners in the Subdivision. To be sure, the 2004 Plat attached to the first set of CC&Rs did reference a "Special Use Area," but that map stated simply that the area was to be "defined in [the] CC&Rs." The original 2004 CC&Rs, as well as each subsequent iteration, contained a definition of the easement. The 2004 CC&Rs appeared to refer to the "Special Use Area" depicted on the 2004 Plat as a "[u]se [c]orridor," and described that corridor as a "perpetual non-exclusive easement" for the benefit of Lots 1 and 3 to be used for many purposes, including "the right to access" and the right to "walk, run, [or] ride horses." Subsequent amended versions of the CC&Rs made various changes to the definition and scope of the Special Use Area. But each version of the CC&Rs included some definition of the easement, and the various plat maps attached to each version always continued to qualify the Special Use Area as being "defined in [the] CC&Rs." Under these circumstances, the Special Use Area easement was created by written agreement of all lot owners in the Subdivision, as represented by the CC&Rs, and not by plat; the plat maps attached to the CC&Rs were merely aids in the interpretation of the easement created by those CC&Rs. The easement at issue in *Oak Lane*, by contrast, was created only by plat; there was "no contemporaneous filing of [CC&Rs], no formation of a homeowners association, and no creation of a multilateral agreement for" maintenance. 2011 UT 25, ¶ 23 (quotation simplified).

¶23  As noted, express easements may be modified by amending the operative legal instrument. *See* Restatement (Third) of Prop.: Servitudes § 7.1. By repeatedly amending the provisions of the CC&Rs that defined the Special Use Area, the lot owners agreed to modify that express easement, and lawfully did so each time the terms of the CC&Rs were amended; such changes did not require a formal plat amendment. Accordingly, we reject Equine's first argument.

II.

¶24 Next, Equine asserts that the district court erred by determining that the language defining the Special Use Area easement in the June 2006 CC&Rs, including the legal description, was unambiguous, and that the court compounded that error by effectively "reforming" that legal description "without considering extrinsic evidence as to the parties' intent." In addressing these arguments, we first discuss contractual ambiguity, and find merit in Equine's contention that the June 2006 CC&Rs were ambiguous. On that basis, we reverse the district court's summary judgment order and remand for further proceedings. And in an effort to provide guidance that might be useful on remand, we conclude with a discussion of Equine's contention that the court improperly "reformed" the legal description of the Special Use Area easement.

A

¶25 In general, "unambiguous restrictive covenants," including CC&Rs, "should be enforced as written." *See Swenson v. Erickson*, 2000 UT 16, ¶ 11, 998 P.2d 807. But where such covenants are ambiguous, "the intention of the parties is controlling." *See id.*; *see also Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 22, 474 P.3d 481 (stating that, if a contract is unambiguous, "the parties' intentions are determined from the plain meaning of the contractual language . . . , without resort to parol evidence," but if a contract is ambiguous, "parol evidence of the parties' intentions should be admitted" (quotation simplified)). The determination as to whether a written instrument is ambiguous is "a question of law to be determined by the judge," *see Ocean 18 LLC*, 2020 UT App 54, ¶ 23 (quotation simplified), and is therefore the type of question that may appropriately be determined in summary judgment proceedings. Here, the district court determined that

the June 2006 CC&Rs' description of the Special Use Area easement was "not ambiguous" and, on that basis, did not consider the extrinsic evidence submitted by Equine. *See id.* ¶ 22.

¶26    The question whether a written instrument is, or is not, ambiguous is often resolved by analyzing whether the parties to the litigation advance interpretations of the relevant language that are "reasonable." *See Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395; *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994. If only one side, and not the other, advances an interpretation that can be considered reasonable, then the language at issue is not ambiguous, because it is subject to only one reasonable interpretation. *See Brady*, 2019 UT 16, ¶ 53 (explaining that a contract is not ambiguous if "the contract as a whole unambiguously supports one interpretation over the other"). A "reasonable interpretation" is one "that cannot be ruled out, after considering the natural meaning of the words in the contract provision in context of the contract as a whole, as one the parties could have reasonably intended." *Id.* ¶ 55. Thus, "to merit consideration" as a reasonable interpretation, a litigant's interpretation "must be based upon the usual and natural meaning of the language used and may not be the result of a forced or strained construction." *See Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428 (quotation simplified).

¶27    Courts often note that, where *both* of the proffered interpretations can be considered reasonable, the language is necessarily ambiguous. *See, e.g., Ocean 18 LLC*, 2020 UT App 54, ¶ 23 ("Crucially, ambiguity is present only if *both* proffered interpretations of the contract's language are tenable and in keeping with the contract's language." (emphasis in original) (quotation otherwise simplified)). But the same is true where *neither* proffered interpretation is "based upon the usual and natural meaning of the language," and where both are "the result of a forced or strained construction." *See Saleh*, 2006 UT 20, ¶ 17 (quotation simplified); *accord Beckman v. Cybertary*

*Franchising LLC*, 2018 UT App 47, ¶ 83, 424 P.3d 1016 (determining that a contractual provision was ambiguous where "the plain language does not obviously support either alternative" interpretation advanced by the contracting parties, and remanding the issue for the court "to consider extrinsic evidence to determine its meaning"); *see also Cardiello ex rel. Estate of Dairy Consulting, Inc. v. Fike's Dairy, Inc.* (*In re Dairy Consulting, Inc.*), 386 B.R. 135, 163 & n.13 (Bankr. W.D. Pa. 2008) (stating that where "a contract clause is ambiguous because it is susceptible to but two interpretations, both of which are frankly unreasonable" and not in harmony with the relevant text, parol evidence is admissible to clarify the drafters' intentions, even if that evidence points toward an interpretation that is not "in consonance with a reasonable interpretation of the relevant clause"); *Inver Grove Heights Market Place, LLC v. ANC Foods III, Inc.*, No. A07-1197, 2008 WL 2574482, at *3 (Minn. Ct. App. July 1, 2008) (determining that contractual language was ambiguous where neither party's interpretation of the language was "functionally reasonable," because both would "appear to produce absurd results" which "neither party could have intended as the fruit of an arms-length negotiation conducted with the benefit of counsel" (quotation simplified)). Indeed, "if uncertain meanings of terms, missing terms, or other facial deficiencies prevent the court from determining which of the proffered alternative interpretations the parties intended when they entered into the contract, then the court deems the contractual provision at issue ambiguous, and the ambiguity must be resolved by considering extrinsic evidence of the parties' intent." *Brady*, 2019 UT 16, ¶ 53 (quotation simplified).

¶28　The district court properly rejected Equine's proposed interpretation of the relevant contractual language as unreasonable. The June 2006 CC&Rs state that the Special Use Area "shall mean *a portion of*" the shaded area depicted on the March 2006 Plat. (Emphasis added.) Despite this language,

Equine takes the position that the parties to the June 2006 CC&Rs intended for the Special Use Area to encompass *all of* the shaded area depicted on the March 2006 Plat. Thus, under Equine's interpretation, the words "a portion of" must be taken to mean "all of." Such an interpretation is not "based upon the usual and natural meaning of the language," *see Saleh*, 2006 UT 20, ¶ 17 (quotation simplified), and the district court did not err by determining that Equine's interpretation was unreasonable.

¶29     But the district court did err by deeming reasonable the Simmons Parties' proffered interpretation of the June 2006 CC&Rs' description of the Special Use Area easement. Although the Simmons Parties' interpretation of the phrase "a portion of" is facially reasonable, their interpretation of the legal description of the size and shape of the Special Use Area is incompatible with the "usual and natural meaning of the language" used in the legal description. *See id.* The relevant contractual language states that the Special Use Area's boundaries begin "at a point South 66°16′38″ West 1943.76 feet from the Northeast quarter corner" of a section of land. The Simmons Parties contend that the drafting parties actually intended that the Special Use Area's boundaries would begin "at a point South 66°49′59″ West, 1933.88 feet, from the Northeast corner" of the section. In addition, the relevant contractual language states, in the second directional call, that the boundary went "East"; the Simmons Parties contend, however, that the drafters intended for that directional call to read "West."

¶30     Just as "a portion of" cannot linguistically be read to mean "all of," neither can "East" be linguistically interpreted to mean "West," nor can "66°16′38″" be interpreted to mean "66°49′59″." In assessing whether an interpretation "merit[s] consideration" as a reasonable one, courts must compare the proffered interpretation to the language of the contract, and if the language cannot bear the proffered interpretation based on

its "usual and natural meaning," then the interpretation is not reasonable. *See id.*[5]

¶31 The district court acknowledged these linguistic incongruences, but dismissed them as mere "scrivener's errors."[6] However, not all errors made by the scrivener can be resolved through interpretive means; as discussed *infra* part II.B, some are best resolved through reformation of the relevant language. *See Wolf Mountain Resorts, LC v. ASC Utah, Inc.*, 2011 UT App 425, ¶¶ 10–11, 268 P.3d 872 (determining, on the facts of that case, that one party's "allegation of scrivener's error constitute[d] an allegation of mutual mistake" that was most appropriately resolved through reformation).

¶32 Certainly, some of the many errors contained in the Special Use Area's legal description might properly be resolved through interpretive means, in keeping with the contractual language as written. One can, for instance, construe the word

---

5. Equine's proffered interpretation—in addition to containing an interpretation of "portion" incompatible with that term's plain meaning—also suffered from problems similar to those exhibited by the Simmons Parties' interpretation. Equine's position regarding the metes-and-bounds legal description—in which it envisioned the Special Use Area as the entire shaded area depicted on the March 2006 Plat—was also incompatible with the text of that description in the June 2006 CC&Rs.

6. A scrivener's error in a legal instrument is essentially a "typographical" error, wherein the scrivener who was assigned to put the drafters' intentions to paper "made a mistake, either as to the result that he [or she] was instructed to produce, or as to the legal effect of the words . . . used." *See Wolf Mountain Resorts, LC v. ASC Utah, Inc.*, 2011 UT App 425, ¶¶ 5, 10, 268 P.3d 872; *accord Haslem v. Ottosen*, 689 P.2d 27, 30 (Utah 1984).

"Noth" as "North" without doing violence to the contractual language chosen by the parties. And one could also, without harming the language used, infer that the parties intended to insert the word "feet" into the fifth directional call, rather than, say, meters or yards, because the legal description uses feet as its unit of measurement in all of the other calls. But changing "East" to "West," or changing the length of a directional call, is another matter altogether; that type of error, although perhaps the fault of the scrivener, cannot fairly be categorized as one subject to resolution by interpretive inference, or by analysis of the plain meaning of the text.

¶33    Indeed, the district court resolved the matter using more than just interpretive tools. First, the court adopted the Simmons Parties' suggestion that its analysis should begin not with examination of the text of the June 2006 CC&Rs but, instead, with a visual comparison of the two sides' mapped visions of what the Special Use Area should look like. As already noted, neither side's vision of the Special Use Area's shape is consistent with the text of the legal description contained in the CC&Rs. Although we appreciate the district court's effort to narrow the dispute between the parties, it did so in a way that, from the outset, unmoored its "interpretive" analysis from the instrument's text. Second, the Simmons Parties' analysis, adopted by the court, was dependent upon the assistance of expert surveyors, who offered their opinions that the legal description, when plotted as written, pointed to a nonexistent parcel and failed to close, and one of whom offered an opinion that the fourth call—"thence South 0° West 320 feet"—fit nicely into the Simmons Parties' view of the size of the Special Use Area. Thus, the district court's analysis relied on one type of extrinsic evidence to explicate the meaning of the legal description, even though the court purported to merely be interpreting the language of the CC&Rs itself. And finally, as noted, the conclusion the court reached required construing "East" to mean "West," and required construing "66°16'38"" to

mean "66°49′59″″"—interpretations that are incompatible with the instrument's text.

¶34 For these reasons, the interpretation of the relevant contractual language advanced by the Simmons Parties—just like the interpretation advanced by Equine—is inconsistent with the actual text of the document. Neither interpretation is consistent with the contractual text; both interpretations do violence to the "usual and natural meaning of the language used" and are "the result of a forced or strained construction." *See Saleh*, 2006 UT 20, ¶ 17 (quotation simplified). We perceive no appropriate basis upon which the district court could have considered the Simmons Parties' proffered interpretation to be reasonable and consistent with the text of the June 2006 CC&Rs, while at the same time rejecting Equine's proffered interpretation on the basis that it was inconsistent with contractual text. Both proffered interpretations are, in our view, materially inconsistent with the text of the June 2006 CC&Rs, and therefore neither is reasonable.

¶35 Accordingly, the definition of the Special Use Area contained in the June 2006 CC&Rs is ambiguous, and the intent of the drafters cannot be ascertained without resort to extrinsic evidence. The district court erred in concluding otherwise. On this basis, we reverse the district court's summary judgment order, and remand the matter for further proceedings, potentially including consideration of extrinsic evidence.

B

¶36 Although we reverse and remand for the reasons already stated, we nevertheless deem Equine's other contention—that the district court's order had the effect of improperly reforming the June 2006 CC&Rs in the Simmons Parties' favor—worthy of further discussion, in the hope that such discussion might be useful on remand. *See, e.g., State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867 (although reversing on another ground and remanding

for a new trial, nevertheless proceeding to "provid[e] guidance" on "other issues presented on appeal that will likely arise during retrial"). We begin by examining the distinction between interpretation of a legal instrument and reformation of a legal instrument, and then conclude with a limited analysis of the application of those legal principles to the facts of this case.

1

¶37 Our supreme court has emphasized that it is "important to recognize" the distinction between "construction" of deeds and other legal instruments, and "reformation" of those same instruments. *See RHN Corp. v. Veibell*, 2004 UT 60, ¶ 41, 96 P.3d 935. Deed construction, including construction of CC&Rs, is an exercise in contractual interpretation. *See Swenson v. Erickson*, 2000 UT 16, ¶ 11, 998 P.2d 807; *see also Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 19, 379 P.3d 1218 (applying principles of contractual interpretation when interpreting CC&Rs).

¶38 And given that it is an exercise in contractual interpretation, construction of a legal instrument's terms is by nature a more limited exercise than reformation. *See Veibell*, 2004 UT 60, ¶ 41 (stating that "a court of law's ability to construe a deed is more limited than a court of equity's ability to reform a deed"). When interpreting written instruments, courts are "limited to interpreting only the language contained in" the instrument, striving to "determine the parties' intent from the plain language of the four corners of" the instrument. *See id.* ¶¶ 40–41 (quotation simplified). Likewise, when interpreting a contract, a court must attempt to ascertain the meaning of the words chosen by the parties. *See* 17A C.J.S. *Contracts* § 402 (2021) ("Contract interpretation determines the meaning of words in a contract."). Thus, when engaged in an interpretation exercise, courts must attempt to construe the words chosen by the parties,

and may not, as part of that exercise, make alterations that materially change the meaning of the instrument's text.

¶39    In making that interpretive attempt, courts begin by analyzing the language of the instrument and, if the words or phrases in question are unambiguous, courts are to interpret the chosen words according to their plain meaning. *See Veibell*, 2004 UT 60, ¶ 40; *see also Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 (stating that "the best indication of the parties' intent is the ordinary meaning of the contract's terms"); *Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 22, 474 P.3d 481 ("Indeed, where the language used in the contract is facially unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law, without resort to parol evidence." (quotation simplified)). But if the language the parties have chosen is ambiguous, a court—even when undertaking to interpret rather than reform the instrument—may consider extrinsic evidence of the parties' intentions in an effort to ascertain what the parties intended the ambiguous language to mean. *See Veibell*, 2004 UT 60, ¶ 40 ("Extrinsic evidence is admissible to illuminate the intent of the parties if the terms of a deed are ambiguous." (quotation simplified)).

¶40    Reformation of a deed, contract, or other instrument is a different exercise altogether. In a reformation proceeding, the court is asked to do more than just interpret the words chosen by the parties; instead, acting as "a court of equity," it "has the authority to add new terms to [an instrument] or alter the original language of [the instrument] to conform to the parties' intent." *See id.* ¶ 41. Reformation is appropriate when "the dispute [does] not involve differences as to how the [instrument] should be interpreted," but rather is "premised on the[] argument that the parties made a mutual mistake" in setting

forth their intentions. *See Seamons v. Wiser*, 2020 UT App 33, ¶ 17, 462 P.3d 387; *see also Bowen v. Bowen*, 2011 UT App 352, ¶ 14, 264 P.3d 233 (noting that reformation is generally available when there is either "mutual mistake of the parties" or "ignorance or mistake of the complaining party . . . induced by the fraud or inequitable conduct of the other remaining parties"). "Reformation is not available to rewrite a [document] to include terms never contemplated by the parties," *see Veibell*, 2004 UT 60, ¶ 38 (quotation simplified), and may be applied "only if the [c]ourt finds that a mutual mistake was made by the grantor and grantee of the deed, and that the written deed did not conform to their intent," *Williams v. Oldroyd*, 581 P.2d 561, 563 (Utah 1978). Once mutual mistake is shown, extrinsic evidence is admissible to prove the intent of the original parties, even if the mistakenly included language is itself unambiguous. *Seamons*, 2020 UT App 33, ¶ 18 (stating that "an ambiguity is not necessary to admission of parol evidence where reformation is sought on the ground of mutual mistake or fraud" (quotation simplified)).[7] Even in a reformation exercise, however, the usual rules of contractual interpretation—in addition to consideration of extrinsic evidence—may still "assist in ascertaining the intent of the parties." *See Veibell*, 2004 UT 60, ¶ 42.

---

7. The district court determined that the Simmons Parties' motion to dismiss Equine's reformation claim—and, by implication, that reformation claim itself—was rendered moot by the court's determination that the June 2006 CC&Rs could be unambiguously interpreted in the Simmons Parties' favor. But because the absence of ambiguity does not defeat a reformation claim, *see Seamons v. Wiser*, 2020 UT App 33, ¶¶ 17–18, 462 P.3d 387, we wonder about the propriety of the court's mootness determination. In any event, however, given our decision here, the court may need to address the Simmons Parties' motion on remand, should they choose to renew it.

¶41 "Some property disputes may be resolved through either a construction or a reformation analysis," but courts must take care to keep the two exercises distinct. *See id.* ¶ 41. Indeed, "a court may not, in effect, reform [an instrument] when attempting to interpret or construe it." *Id.* (quotation simplified). An illustration may help to illuminate the distinction between interpretation and reformation: a court engaging in an interpretive exercise may consider whether the drafters of a document, by choosing the word "north," meant, say, true north or magnetic north, since either meaning could be a reasonable interpretation of the word "north"; but courts engaging in the *construction* of contracts may not *interpret* the word "north" to mean "south," because the word "north," on its face, cannot be construed to mean something that is the polar opposite of the plain text. In order to change "north" to "south," *reformation* of the instrument is required, and would be entirely appropriate— even though "north" is not necessarily ambiguous—upon a showing that the parties made a mutual mistake by using the word "north" instead of "south," and actually intended to use the word "south."

2

¶42 In this case, Equine included a reformation claim in its complaint, alleging that the drafters of the June 2006 CC&Rs had made a mistake, and had intended for the boundaries of the Special Use Area to encompass all of the shaded area on the 2006 Plat. The Simmons Parties, in their counterclaim, did not seek reformation of the June 2006 CC&Rs; in addition, they moved to dismiss Equine's reformation claim on summary judgment, asserting that the claim was barred by the applicable statute of limitations. The district court denied that motion as moot, after determining that the Simmons Parties advanced the only reasonable interpretation of the June 2006 CC&Rs. Because neither party appealed the court's ruling that the Simmons Parties' summary judgment motion on Equine's reformation

claim was moot in light of its other rulings, we express no opinion about whether Equine's reformation claim is, or is not, time-barred.[8] Nor do we opine about what the proper course of action would be in a situation in which reformation of a contract is necessary—one way or the other—but where a party may be barred on statute of limitations grounds from seeking reformation. But now that we have reversed the district court's summary judgment order, it may become necessary, on remand, for the court to consider the extent to which reformation is available to the parties in this case.

¶43 In our view, Equine persuasively argues on appeal that the district court's summary judgment order effectively reformed the CC&Rs in favor of the Simmons Parties, despite the fact that the court professed to merely be interpreting the CC&Rs, and despite the fact that the Simmons Parties did not

---

8. Under Utah law, an action to reform an instrument based on fraud or mistake must be brought within three years of "the discovery by the aggrieved party of the facts constituting the fraud or mistake." Utah Code Ann. § 78B-2-305(3) (LexisNexis 2018). And we have previously clarified that knowledge that the instrument was recorded does not necessarily constitute "'notice [or discovery] of the facts constituting the fraud' or mistake." *See Wells Fargo Bank, NA v. Noerring*, 2018 UT App 232, ¶ 24, 438 P.3d 90 (quoting *Smith v. Edwards*, 17 P.2d 264, 270 (Utah 1932)). Assessment of when the aggrieved party "discovered or reasonably should have discovered" the facts constituting the fraud or mistake "is often a difficult and intensely fact-dependent inquiry." *Id.* ¶ 20 (quotation simplified). On remand, if the Simmons Parties renew their motion, the court will need to engage in such an inquiry to determine when Equine discovered or reasonably should have discovered the mistakes in the metes-and-bounds description and, based on that determination, assess whether its reformation claim was timely filed.

themselves seek reformation. As Equine points out, the relief afforded by the district court necessarily included the following material changes to the legal description: (1) excising the word "quarter" from the description of the point of beginning; (2) changing "South 66°16′38″ West 1943.76″ to "South 66°49′59″ West, 1933.88″ in the description of the point of beginning; and (3) changing "East" to "West" in the second directional call. These changes are more than interpretive; they involve actually changing the text of the relevant contractual language, and are not compatible with the existing language of the June 2006 CC&Rs. Indeed, these changes materially alter the meaning of the June 2006 CC&Rs. The 66°16′38″ directional call cannot be *interpreted* to mean 66°49′59″. A distance of 1943.76 feet cannot be *interpreted* to mean 1933.88 feet. And "East" cannot be *interpreted* to mean "West." These changes require reformation. Our supreme court has noted that "a court may not reform a deed under the guise of deed construction," *see Veibell*, 2004 UT 60, ¶ 42, and that appears to be the effect of the district court's summary judgment order here. Furthermore, reformative changes cannot be made to a legal instrument without considering extrinsic evidence from both parties, because "the intention of the parties is controlling" and, in cases involving fraud or mistake, the intent of the parties cannot be divined from the text alone. *See id.* ¶¶ 36, 38 (quotation simplified).

¶44 In this case, the positions taken by both sides appear to lend themselves to reformation claims based on mutual mistake. Equine claims, based on sworn affidavits from Founder and Member, that the drafters of the June 2006 CC&Rs did not intend to shrink the Special Use Area, and that a mistake was made in the drafting of those CC&Rs. *See id.* ¶¶ 36, 37 (stating that "reformation of a deed is appropriate where the terms of the written instrument are mistaken in that they do not show the true intent of the agreement between the parties," and that mutual mistake generally encompasses any "error in reducing the concurring intentions of the parties to writing" (quotation

simplified)). And the Simmons Parties point to a botched metes-and-bounds legal description, a situation that our supreme court has previously held to be a proper candidate for reformative relief. *See, e.g., Jensen v. Manila Corp. of the Church of Jesus Christ of Latter-day Saints*, 565 P.2d 63, 64 (Utah 1977) (holding that, even "if the description of the property is definite and certain," "parol evidence is admissible in an action for reformation[] to show the writing did not conform to the intent of the parties"); *Losee v. Jones*, 235 P.2d 132, 137 (Utah 1951) (stating that "the intention of the parties is the controlling consideration" in reforming a deed where the calls of a metes-and-bounds description "fail[ed] to close"); *see also Seamons*, 2020 UT App 33, ¶¶ 16–18 (holding that extrinsic evidence was admissible in a deed reformation action to show that a legal description of property contained a mutual mistake); *Wolf Mountain Resorts, LC v. ASC Utah, Inc.*, 2011 UT App 425, ¶ 11, 268 P.3d 872 (stating that an "allegation of scrivener's error constitutes an allegation of mutual mistake by the parties as to the language of the" contract).[9]

---

9. The Simmons Parties suggest that we should not look to *Wolf Mountain Resorts* for assistance, but instead urge us to consider the case of *Burningham v. Westgate Resorts, Ltd.*, 2013 UT App 244, 317 P.3d 445. That case, however, is no help to the Simmons Parties. In *Burningham*, the parties' agreement contained a scrivener's error: the parties apparently intended to write "Section 38.1," but instead the agreement stated "Section 39.1." *Id.* ¶ 17. Due to the existence of the error, the district court appeared willing to consider extrinsic evidence, but because no party presented any such evidence that the drafters intended to refer to any section other than 38.1, the district court resolved the matter summarily, and this court affirmed. *Id.* ¶¶ 17–19. Thus, *Burningham* does not support any argument that extrinsic evidence is not admissible to resolve scrivener's errors, but rather stands for the proposition that a party cannot make a

(continued…)

¶45     Our reversal of the district court's summary judgment order means that the Simmons Parties' motion for summary judgment on Equine's reformation claim is no longer moot (if indeed it was ever moot, *see supra* note 7). On remand, the court will need to reconsider that motion, and address whether Equine—or the Simmons Parties, for that matter—may properly seek reformation, a remedy that seems well suited for addressing the problems presented by the June 2006 CC&Rs. If reformation is unavailable, the court will also need to consider whether it can afford either party the type of relief they seek, given our supreme court's mandate that "a court may not, in effect, reform a deed when attempting to interpret or construe it." *See Veibell*, 2004 UT 60, ¶ 41 (quotation simplified).

## CONCLUSION

¶46     The district court correctly determined that the owners of the lots in the Subdivision could alter the description of the Special Use Area by amending the CC&Rs, and did not need to undertake a formal amendment of the Subdivision plat. However, the district court erred by determining that the Simmons Parties' proffered interpretation of the June 2006 CC&Rs' description of the Special Use Area was reasonable, erred by determining that the description was clear and unambiguous, and erred by declining to consider extrinsic evidence regarding the drafters' intent. We therefore reverse the district court's summary judgment order, and remand for further proceedings consistent with this opinion.

———————

(…continued)
prima facie showing of mutual mistake without offering extrinsic evidence of the drafters' intent. Here, Equine did offer such evidence; it was simply not considered by the district court.

# APPENDIX A

## March 2006 Subdivision Plat Map (Showing Special Use Area Boundaries Advocated by Equine)



## Special Use Area Boundaries Advocated by Simmons Parties (with Asserted Western Border in Bold)