**2022 UT App 139**

## THE UTAH COURT OF APPEALS

DENNIS C. ELLIS AND MARIA ELLIS,
Appellants,
*v.*
LA VAL ENTERPRISES LTD., MIKLE VAL ELLIS, KELLY D. ELLIS,
SHELLY ROWLAN, AND STACEY ROWLAN,
Appellees.

Opinion
No. 20210546-CA
Filed December 8, 2022

Fourth District Court, Heber Department
The Honorable Jennifer A. Brown
No. 200500032

Troy L. Booher, Beth E. Kennedy, Caroline A. Olsen,
James L. Ahlstrom, Kara M. Houck, and Victoria
Rose Luman, Attorneys for Appellants

David R. Nielson and Nathan D. Anderson,
Attorneys for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGE DAVID N. MORTENSEN and SENIOR JUDGE RUSSELL W.
BENCH concurred.[1]

HARRIS, Judge:

¶1   In 1996, the Ellis family created a limited partnership—
with the parents (Val and LaVern[2]) as general partners and their

---

1. Senior Judge Russell W. Bench sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

2. As is our practice when multiple parties to an appeal share the
same last name, we refer herein to the members of the Ellis family
(continued…)

five children as limited partners—and conveyed the family farm into the partnership. In 2017, after Val's death, LaVern—in her capacity as the only remaining general partner—signed a contract giving one of the children and his spouse an option to purchase the farm at a set price. The narrow question presented in this interlocutory appeal is whether LaVern, as the general partner, had authority—under the partnership agreement and governing law—to enter into the option contract on behalf of the partnership. The district court determined that she had no such authority. We disagree and therefore reverse.

BACKGROUND

¶2     Val and LaVern Ellis raised their five children on approximately 174 acres of land (the Property) that included the family home as well as over thirty acres of farmland. In 1996, Val and LaVern created a limited partnership, which they named La Val Enterprises Ltd. (the Partnership), and into which they transferred ownership of the Property and associated farming equipment. The Partnership was created with the assistance of an attorney, and the partners entered into a twenty-nine-page agreement (the Agreement) that governs the Partnership's affairs. Under the terms of the Agreement, Val and LaVern were installed as the Partnership's general partners, and their five children— Mikle, Dennis, Kelly, Shelly, and Brad—were made limited partners. The terms of the Agreement are crucial to this appeal, so we take the time to set out the relevant provisions in some detail.

¶3     At the outset, the Agreement states that the Partnership was formed "pursuant to the provisions of Utah Code Annotated, Title 48, Chapter 2a (1953, as amended)," and that the "rights, duties and liabilities" of the partners will be "determined under that law except as otherwise expressly provided in this Agreement." In 1996, at the time the Agreement was executed,

_____

by their first names, with no disrespect intended by the apparent informality.

that title and chapter of the Utah Code was entitled the "Utah Revised Uniform Limited Partnership Act." *See* Utah Code Title 48, Chapter 2a (Michie 1996). In three other places in the Agreement, the partners specified that certain issues concerning the scope of the general partners' powers would be governed "by the Uniform Revised Limited Partnership Act as in effect in the State of Utah."

¶4 The Agreement also contains a section (the Purposes Section) setting forth the overarching purposes of the Partnership, and stating that the Partnership had been "formed and shall be maintained for" four general purposes:

- "To acquire, hold, and own real property, including, but not limited to, [the Property], and, consistent therewith, to use, develop, improve, manage, lease, exchange, transfer, sell, or otherwise dispose of such real property."

- "To consolidate fractional interests in the real property, to continue the ownership in the real property and to restrict the right of third parties to acquire any interest in the real property."

- "To provide protection to the real property from future creditor claims against the Partners, and to prevent a Partner's interest in the Partnership from being transferred because of a failed marriage."

- "To provide flexibility in business planning."

¶5 The partners also agreed to specific provisions setting forth the scope of the general partners' authority. Section 7.1 states that "[t]he business of the Partnership shall be under the full and exclusive management of the General Partners," and that "the General Partners are charged with all operational responsibilities of the Partnership." And Section 7.3—entitled "Powers of General Partners"—provides additional specificity, making clear that the

general partners are authorized to take significant action without first obtaining the consent of any of the limited partners:

*Except as otherwise provided in this Agreement*, the General Partners shall have the *full and exclusive powers* to control the business and affairs of the Partnership and shall, *in their absolute discretion and without the consent of the Limited Partners*, have power to make and carry out *all decisions affecting Partnership business and affairs*, including, without limitation, the power to:

(a) *sell*, transfer, lease, borrow, mortgage, pledge, *or otherwise dispose of all or part* of the Partnership assets and property *upon such terms and conditions and for such consideration as the General Partners deem appropriate*.

. . . .

(g) borrow money from banks, other lending institutions, and other lenders for any Partnership purpose (except as specifically prohibited by this agreement), and in connection therewith issue notes, debentures and other debt securities and hypothecate the assets and property of the Partnership to secure repayment of borrowed funds.

. . . .

The fact that a General Partner or member of his or her family is directly or indirectly interested in or connected with any person, firm or corporation . . . to whom the Partnership may sell or lease assets or property shall not prohibit the [P]artnership from . . . dealing or doing business with such person, firm

or corporation . . . under reasonable terms and conditions.

(Emphasis added.) And the Agreement gives the Partnership's general partners, as "additional rights and powers," "all of the rights and powers of a general partner as more particularly provided by the Uniform Revised Limited Partnership Act as in effect in the State of Utah, except to the extent any of such rights may be limited or restricted by the express provisions of this Agreement."

¶6 The Agreement does, however, contain a section (Section 7.5) entitled "Limitation on Powers," which sets forth some limitations on the broad authority bestowed on the Partnership's general partners. These limitations make clear that the general partners "shall not have any authority to" do the following:

- Take "any act in contravention of this Agreement."

- Take "any act which would make it impossible to carry on the ordinary business of the Partnership."

- "[P]ossess Partnership assets or property or assign the rights of the Partnership in specific assets or property for other than a Partnership purpose, except as otherwise specifically provided for herein."

- Take "any act for which the Limited Partners' consent is required by the Uniform Revised Limited Partnership Act as in effect in the State of Utah."

- "[E]ngage in any business activity other than that consistent with the purposes of the Partnership."

- "[T]erminate, liquidate and wind-up the Partnership, except as otherwise provided" in the Agreement.

¶7   All seven family members executed the Agreement in late 1996 or early 1997. And the Agreement was never amended; that is, the version of the Agreement originally executed in 1996 is (and has been at all times relevant to this appeal) the current version of the Agreement.

¶8   Over the years, as the Ellis children grew into adulthood, Dennis took more of an active role in the farm than his siblings did, especially after Val suffered a stroke in the mid-1980s that limited his ability to manage the farm. In the present litigation, however, Dennis and his siblings take vastly different positions about how helpful Dennis was in farm management, with Dennis portraying himself as a helpful caretaker and his four siblings (the Siblings) portraying him as something of a freeloader.

¶9   Val passed away in 2015, leaving then-eighty-year-old LaVern as the Partnership's only general partner. Over the next few years, LaVern suffered various health problems, both mental and physical. In 2017, Dennis and LaVern discussed the possibility of Dennis and his wife Maria purchasing the Property and, together, Dennis and LaVern sought the input of the attorney (Attorney) who had drafted the Agreement in 1996. Attorney offered his opinion that the Agreement gave LaVern, as the sole remaining general partner, the authority to sell the Property without first obtaining the consent of the limited partners, and he provided Dennis a template for an option-to-purchase contract. Thereafter, Attorney worked with Dennis to create a document (the Option Contract) that would give Dennis and Maria an option to purchase the Property. The purchase price set in the Option Contract was $750,000, an amount Dennis came up with by discounting a 2016 appraisal—which had valued the Property at $1,075,000[3]—due to his belief that LaVern desired "to account

---

3. The county valuation, for property tax purposes, for the same period was initially $4,343,784, but Dennis later used the 2016 private appraisal to challenge the county's valuation, and the county eventually reduced its valuation to approximate the privately appraised value.

for all the services provided and money invested by Dennis over the years at the Property." LaVern executed the Option Contract in July 2017. Dennis was aware that LaVern had signed the Option Contract, but neither he nor LaVern immediately told the Siblings about it.

¶10   Two years later, LaVern passed away. Soon after LaVern's death, Dennis informed the Siblings of the existence of the Option Contract, and notified the Partnership of his intention to exercise the contractual option. The Partnership, however, refused to honor the Option Contract, believing that LaVern had not possessed authority, under the Agreement, to enter into it and, in addition, taking the position that LaVern was under the undue influence of Dennis when she did so. Dennis and Maria responded by filing the instant lawsuit, and the Partnership and the Siblings filed a counterclaim.

¶11   Some of the parties' claims put at issue the question of whether the Agreement gave LaVern, as sole remaining general partner, the authority to enter into the Option Contract. Eventually, both sides filed competing motions for partial summary judgment on that discrete question. Dennis and Maria focused largely on Section 7.3 of the Agreement, the provision stating that the Partnership's general partners have broad powers to sell Partnership property, in their discretion, without first obtaining the approval of the limited partners. The Siblings focused largely on Section 7.5, the part setting forth various limitations on the general partners' powers, and on provisions of post-2013 Utah partnership law that, as a default rule, require general partners to obtain the consent of limited partners before selling "all, or substantially all, of" the partnership's property, or before undertaking acts not "in the ordinary course of the limited partnership's activities and affairs." *See* Utah Code Ann. §§ 48-2e-402(2), -406(2)(c) (LexisNexis 2015).

¶12   After full briefing and oral argument, the district court issued an oral ruling siding with the Siblings. The court determined, as an initial matter, that "the current version of the

Limited Partnership Act" applies to govern the parties' dispute, and not the 1996 statute referenced in the Agreement. In reaching that determination, the court interpreted the Agreement's multiple references to the law "as in effect" as indicating the partners' willingness to be bound by current law rather than the law in effect at the time the Agreement was signed. The court noted that current law, enacted in 2013, provides that, unless the parties agree otherwise, general partners require the consent of all partners before selling "all, or substantially all, of" the partnership's property, or before entering into transactions that are not "in the ordinary course of" the partnership's "activities and affairs." *See id.* Observing that the Agreement had not been amended since the 2013 statutory amendments, the court offered its view that those relatively new statutory default provisions had not "been overruled" by the partners. The court acknowledged the broad language of Section 7.3 purportedly authorizing general partners, within their "full and exclusive" discretion, to sell Partnership property, but concluded that LaVern was "limited by Section 7.5's limitations" and did not have authority to enter into the Option Contract. The court later memorialized its ruling in a written order granting the Siblings' motion for partial summary judgment on the authority issue, denying the one filed by Dennis and Maria, and dismissing with prejudice several of the causes of action filed by Dennis and Maria.

## ISSUE AND STANDARD OF REVIEW

¶13    We granted Dennis and Maria leave to take an interlocutory appeal from the court's summary judgment order. "Summary judgment is only appropriate if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Arlington Mgmt. Assocs. Inc. v. Urology Clinic of Utah Valley LLC*, 2021 UT App 72, ¶ 10, 496 P.3d 719 (quotation simplified). We review a district court's summary judgment ruling "for correctness, giving no deference to the [district] court's decision." *Bahr v. Imus*, 2011 UT 19, ¶ 16, 250 P.3d 56.

ANALYSIS

¶14  The question presented by this appeal is whether LaVern had authority, under the Agreement and applicable law, to enter into the Option Contract without first obtaining the consent of the limited partners, including the Siblings. We begin our analysis with a general discussion of Utah partnership law as it has developed since 1990, paying specific attention to the state of the law as it existed in 1996 (when the Agreement was signed) and as it existed in 2017 (when the Option Contract was signed). We then examine the provisions of the Agreement against this legal backdrop, and conclude that the Agreement unambiguously gave LaVern authority to enter into the Option Contract, and that the district court erred in determining otherwise.

I. Legal Background: Utah Partnership Law

¶15  In 1990, our legislature enacted a law entitled "Revised Uniform Limited Partnership Act." *See* Act of Mar. 12, 1990, ch. 233, §§ 1–71, 1990 Utah Laws 1126 (codified at Utah Code §§ 48-2a-101 to -1107 (Michie 1996)). This law—as the word "Uniform" in its title connotes—was based on a draft law released by the Uniform Law Commission (the Commission), an entity created to "promote uniformity in the law among the several States on subjects as to which uniformity is desirable and practicable." *See The Constitution*, Uniform Law Commission, art. 1, § 1.02, https://www.uniformlaws.org/aboutulc/constitution [https://perma.cc/73CT-4BUV]. Composed of lawyers, judges, law professors, and legislators, the Commission has, to date, drafted over 250 proposed uniform laws in furtherance of its efforts to bring "clarity and stability to critical areas of state statutory law." *About Us*, Uniform Law Commission, https://www.uniformlaws.org/aboutulc/overview [https://perma.cc/KA7L-GXBJ]; *see generally Uniform Laws and Model Acts*, Harvard Law School Library, https://guides.library.harvard.edu/law/unifmodelacts#:~:text=Model%20Acts%20and%20Model%20Codes,are%20rarely%20enacted%20in%20entirety [https://perma.cc/M9SM-5LGS] ("Uniform Laws are carefully drafted model laws for potential enactment by

state legislatures."). Individual state legislatures may adopt proposed uniform laws without amendment, may adopt them with state-specific modifications, or may reject (or ignore) them entirely.

¶16 Partnership law is one area in which the Commission has been active and, in 1985, it released a new version of its proposed uniform law in this arena, this time entitled "Revised Uniform Limited Partnership Act (RULPA)." *See Limited Partnership Act, Revised*, Uniform Law Commission, https://www.uniformlaws.o rg/committees/community-home?CommunityKey=d9036976-6c9 0-4951-ba81-1046c90da035 [https://perma.cc/582W-SZ2J] (stating that the 1985 "version of the act became known as Revised Uniform Limited Partnership Act (RULPA)"). Five years later, in its 1990 session, our legislature adopted a version of RULPA, but only after making a number of Utah-specific changes to the proposed uniform law. *See* Act of Mar. 12, 1990, ch. 233, §§ 1–71, 1990 Utah Laws 1126, 1126–40. Our legislature specifically entitled this law "Revised Uniform Limited Partnership Act" and, as already noted, this law was codified in Title 48, Chapter 2a of the Utah Code. *See id.*; Utah Code §§ 48-2a-101 to -1107 (Michie 1996).

¶17 The relevant portions of this law, passed in 1990, remained in effect in 1996, when the Agreement was created and executed. The 1996 version of that law established—as a default setting, in the absence of provisions to the contrary in partnership agreements—that general partners had broad powers to manage partnership affairs, without having to first seek the consent or approval of the partnership's limited partners. *See* Utah Code §§ 48-2a-302, 403(1) (Michie 1996). No provision of RULPA, as enacted by our legislature, required that general partners seek or obtain the consent of limited partners for any specific action other than voluntary dissolution. *See id.* § 48-2a-801 (listing five ways a partnership could be dissolved, including by the "written consent of all partners"). Thus, under the law as it existed in 1996, nothing in Utah partnership law—setting aside, for the moment, the terms of the Agreement itself—would have required Val and LaVern, as

general partners, to seek the consent of the Partnership's limited partners about anything other than voluntary dissolution.

¶18    In the late 1990s, "[c]hanges in modern business practices made it necessary" for the Commission "to update and modernize" its proposed uniform partnership law. *See Limited Partnership Act, Revised*, Uniform Law Commission, https://www .uniformlaws.org/committees/community-home?CommunityKe y=d9036976-6c90-4951-ba81-1046c90da035 [https://perma.cc/582 W-SZ2J]. In 2001, the Commission "adopted a new, more flexible version" of the law. *Id.* This version "was colloquially called Re-RULPA during the drafting process but then was officially named the Uniform Limited Partnership Act (2001) or ULPA (2001)." *See Uniform Limited Partnership Act*, Wikipedia, https://en.wikipedia. org/wiki/Uniform_Limited_Partnership_Act [https://perma.cc/TJ C9-EBDQ]. Among other changes from RULPA, the 2001 version of the uniform partnership law contained provisions—designed as default rules that would apply in the absence of contrary provisions in individual partnership agreements—limiting the power of general partners and, in particular, requiring general partners to obtain the consent of all partners, including limited partners, before taking certain actions. *See* Unif. Ltd. P'ship Act §§ 105, 402(b), 406(b) (Unif. L. Comm'n 2001).

¶19    In 2013, our legislature passed a law patterned after the Commission's 2001 ULPA. *See* Act of Apr. 1, 2013, ch. 412, §§ 148–276, 2013 Utah Laws 2245–88. The new law provided for the graduated repeal of Title 48, Chapter 2a, the chapter which contained Utah's version of RULPA. *See* Utah Code § 48-2a-100 (2013); *see also* Utah Code Ann. § 48-2e-1205(1) (LexisNexis 2015). Effective January 1, 2016, RULPA was to be completely repealed. *See* Utah Code § 48-2a-100 (2013). In the meantime, RULPA would continue to apply to partnerships formed before January 1, 2014, unless those partnerships elected to be governed by the new version of Utah partnership law. *See* Utah Code Ann. § 48-2e-1205(1) (LexisNexis 2015).

¶20 The new law, enacted in place of RULPA, is entitled the "Utah Uniform Limited Partnership Act," *see id.* § 48-2e-101, and is codified in Title 48, Chapter 2e (as opposed to Chapter 2a) of the Utah Code, *see id.* §§ 48-2e-101 to -1205. As relevant here, the new law states that, "[t]o the extent the partnership agreement does not provide" otherwise, *see id.* § 48-2e-112(2), all partners—including limited partners—must consent to both (a) any transaction involving the sale or other disposition of "all, or substantially all, of the limited partnership's property," and (b) any transaction that is "not apparently for carrying on in the ordinary course the limited partnership's activities and affairs." *See id.* §§ 48-2e-402(2), -406(2)(c). Thus, under the law as it existed in 2017, Utah partnership law—unless varied by the terms of the Agreement—would have required LaVern, as general partner, to seek the consent of the limited partners before selling "all, or substantially all, of" the Partnership's property, or before taking any action not "in the ordinary course of" the Partnership's "activities and affairs."

## II. The Agreement

¶21 With this legal background in mind, we turn to an examination of the terms of the Agreement. The ultimate question before us is whether LaVern had authority, under that document and applicable law, to execute the Option Contract. In addressing that question, we find it helpful to break our analysis into two parts. First, we assess whether Val and LaVern would have had authority to enter into the Option Contract in 1996, when the Agreement was signed but before Utah's repeal of RULPA and passage of ULPA. Second, we assess whether those 2013 legislative changes altered the situation. For the reasons discussed, we conclude that the Partnership's general partners did have authority, under the Agreement, to enter into transactions like the Option Contract, and that the 2013 legislative amendments did not change the relevant landscape.

A.     Pre-2013: The General Partners Had Authority

¶22    We begin our analysis of the terms of the Agreement with an examination of the specific provisions governing the authority of the Partnership's general partners: Sections 7.1 and 7.3. Those provisions are entitled "Management" and "Powers of General Partners," respectively, and they contain language conferring broad discretionary management powers on the Partnership's general partners. Section 7.1 states broadly that "[t]he business of the Partnership shall be under the full and exclusive management of the General Partners." And Section 7.3—quoted more extensively, *supra* ¶ 5—bestows upon the general partners "full and exclusive powers to control the business and affairs of the Partnership . . . in their absolute discretion and without the consent of the Limited Partners."

¶23    In addition to this broad general language, Section 7.3 also includes an illustrative list of some of the specific "decisions" that the general partners are empowered to make "without the consent of the Limited Partners." As particularly relevant here, the general partners are specifically authorized to "sell . . . or otherwise dispose of all or part of the Partnership assets and property upon such terms and conditions and for such consideration as the General Partners deem appropriate." Dennis and Maria assert that this provision is more or less dispositive: on its face, it specifically authorizes LaVern to sell the Property to Dennis and Maria without first seeking the consent or approval of the Partnership's limited partners.

¶24    In response, the Siblings acknowledge that the language of Section 7.3 provides support for the arguments lodged by Dennis and Maria, but they respond by pointing to the first seven words of that section: "Except as otherwise provided in this Agreement." They assert that other provisions of the Agreement limit the general partners' authority to sell the Property, and they center their arguments around Section 7.5, the one entitled "Limitation on Powers." That section contains eight specific limits on the general partners' authority, six of which the Siblings contend

apply here. We address the applicability of each of the six claimed limitations, in turn, and conclude that—at least prior to the 2013 legislative amendments—none of them operated to prevent the Partnership's general partners from selling the Property.

¶25 **Section 7.5(a)**: The Siblings point to the first subsection in Section 7.5, which bars the general partners from undertaking "any act in contravention of" the Agreement. The Siblings assert that LaVern acted in contravention of the Agreement when she entered into the Option Contract. We find the Siblings' argument on this point wholly unpersuasive, given the specific language of Section 7.3 that clearly authorizes the general partners to sell the Property without first seeking the consent of the limited partners.

¶26 **Sections 7.5(b) and (h)**: Next, the Siblings point to subsections (b) and (h), one of which prevents the general partners from undertaking "any act which would make it impossible to carry on the ordinary business of the Partnership," and the other of which prevents the general partners from "terminat[ing], liquidat[ing] and wind[ing]-up the Partnership" except as authorized by the Agreement's dissolution provision. They assert that selling the Property was an act that made it impossible to carry on the Partnership's ordinary business— which they characterize as operating a farm—and they assert that it effectively dissolved the Partnership. We find these arguments likewise unpersuasive. The Partnership was formed to (among other things) buy, hold, and sell real property, "including, but not limited to," the Property. If the Property were sold, the Partnership would receive value in return, and it could decide to use the proceeds from the sale to (among other things) buy different parcels of real property or other assets, or it could simply distribute the proceeds to the partners according to their respective interests. Thus, selling any part of the Partnership's property, including the Property, is not an act that would "make it impossible to carry on the ordinary business of the Partnership," and it is certainly not an act that effectively dissolves or liquidates the Partnership.

¶27    **Sections 7.5(d) and (g)**: Next, the Siblings point to two more of the Section 7.5 limitations, each of which references the Partnership's "purposes." One such provision forbids general partners from "assign[ing] the rights of the Partnership in specific assets or property for other than a Partnership purpose, except as otherwise specifically provided herein." The other bars general partners from "engag[ing] in any business activity other than that consistent with the purposes of the Partnership." As noted, *supra* ¶ 4, the Purposes Section of the Agreement recites the Partnership's purposes, which include buying, holding, and selling real property, as well as "restrict[ing] the right of third parties to acquire any interest in the real property." The Siblings assert that these limitations that refer to the Partnership's general purposes operate to override the more specific authorization in Section 7.3 that permits general partners to sell Partnership property. We disagree.

¶28    As an initial matter, one of the expressly listed purposes of the Partnership—set forth in the Purposes Section—is to "sell, or otherwise dispose of," the Partnership's property, including its real property. This stated purpose is entirely consistent with Section 7.3's grant of authority allowing general partners to "sell . . . or otherwise dispose of all or part of the Partnership assets or property upon such terms and conditions" as the general partners "deem appropriate." The Siblings point out, in response, that the Purposes Section states that any sale of the Partnership's real property must be "consistent" with the Partnership's goal of "acquir[ing], hold[ing] and own[ing] real property." But as noted already, a sale of one parcel of real property will, almost by definition, result in assets (most likely money) returning to the Partnership as consideration for the sale, which assets the Partnership could then use to acquire a different parcel of real property. Stated another way, the sale of any one parcel of real property is not at all inconsistent with a general partnership goal of acquiring, owning, and holding real property. After all, the Purposes Section does not state that the Partnership's purpose is to "hold and own" the Property specifically; to the contrary, it says that the Partnership's purpose is to "acquire, hold and own

real property, including, but not limited to, [the Property]." The Agreement, including the Purposes Section, unambiguously provides that the Partnership was formed to (among other things) sell real property, and therefore selling *this* Property is not inconsistent with the overall purposes of the Partnership.[4]

¶29    The Siblings also point out that another of the purposes set forth in the Purposes Section is "to restrict the right of third parties to acquire any interest in the real property," and they assert that Maria should be considered a third party. Even assuming that to be the case, however, the Agreement does not forbid third parties from acquiring interests in Partnership property, including real property. Section 7.3 gives general partners "absolute discretion" over the "terms and conditions" of any sale of Partnership property; moreover, the final paragraph in that section specifies that such sales may be to family members (e.g., a son and daughter-in-law) of general partners. In addition, Section 7.3 also makes clear that third-party lending institutions may acquire security interests in Partnership real property. It is simply not a reasonable reading of the Agreement to interpret it to completely

---

4. Indeed, the Siblings concede that "the Partnership could," consistent with its purposes, "sell its property for market value to purchase another comparable piece of real property." However, they assert that the purchase price listed in the Option Contract ($750,000) is far below market value and insufficient to allow the Partnership to purchase equivalent property in exchange, and therefore contrary to the stated purposes of the Partnership. Dennis and Maria contest these assertions; they claim that $750,000 is only somewhat lower than actual fair market value and assert that any difference is due to LaVern's desire to reward Dennis for his efforts on the farm. We need not resolve this factual dispute—which may very well be inappropriate for resolution on summary judgment in any event—in this appeal because the Agreement specifically states that general partners have "absolute discretion" over the "terms and conditions" of any sale of Partnership property, including the price. Nothing in the Purposes Section is to the contrary.

forbid—rather than merely to "restrict," in certain ways not relevant here—the sale of Partnership property to third parties.[5]

¶30 In addition, we are mindful that, in interpreting documents, "specific provisions ordinarily will be regarded as qualifying the meaning of broad general terms in relation to a particular subject." *See Smith v. Smith*, 2017 UT App 40, ¶ 16, 392 P.3d 985 (quotation simplified); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012) ("Under this canon, the specific provision is treated as an exception to the general rule."). Section 7.3 is a very specific provision which describes in detail the power and authority of general partners in managing the Partnership, and its specific terms will override—to the extent there is any inconsistency—the very general description of the Partnership's overall purposes set out in the Purposes Section. Indeed, the specifics of Section 7.3 help illuminate what sort of actions the partners believed were consistent with the purposes of the Partnership; in our view, Section 7.3's clear provisions unambiguously indicate that it is not contrary to the stated purposes of the Partnership for the general partners to sell all or part of the Partnership's property, even without first obtaining the consent of the limited partners.

¶31 In sum, nothing in the Purposes Section of the Agreement overrides the clear authorization in Section 7.3 permitting LaVern, as the general partner, to sell or otherwise dispose of the Property.

¶32 **Section 7.5(f)**: Finally, the Siblings invoke the limitation that prevents the general partners from undertaking "any act for which the Limited Partners' consent is required by the Uniform Revised Limited Partnership Act as in effect in the State of Utah." As noted, from 1996 through 2013, no provision in Utah's version

---

5. Indeed, the Siblings eventually concede, in their brief, that "[i]f LaVern wanted to sell the Partnership's property to a third party like Maria she could do so, so long as it was for a Partnership purpose and didn't violate the [A]greement or" applicable Utah partnership law.

of RULPA required general partners to seek the consent of limited partners before selling partnership property. Thus, when the Ellis family entered into the Agreement in 1996, and for at least the next seventeen years, Utah partnership law placed no restrictions on the general partners' ability to sell or otherwise dispose of all or part of the Partnership's property, even without first obtaining the approval of the limited partners.

¶33    Thus, at least as concerns the time frame from 1996 through 2013, the Agreement unambiguously gave Val and LaVern, as general partners, the authority to sell or otherwise dispose of the Property, even to third parties, without first seeking the consent of their children. Under the interpretation of the Agreement offered by Dennis and Maria, all of the Agreement's provisions have meaning, and can be read together harmoniously. *See generally Thatcher v. Lang*, 2020 UT App 38, ¶ 31, 462 P.3d 397 ("When interpreting the plain language, we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless." (quotation simplified)). The Siblings' contrary interpretation is strained and unreasonable, and requires us to effectively read Section 7.3 out of the Agreement. *See generally Brady v. Park*, 2019 UT 16, ¶ 54, 445 P.3d 395 ("[A] contractual term or provision is ambiguous if it is capable of more than one *reasonable* interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." (quotation simplified, emphasis in original)); *see also Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428 (stating that, "to merit consideration" as a reasonable interpretation, a litigant's interpretation "must be based upon the usual and natural meaning of the language used and may not be the result of a forced or strained construction" (quotation simplified)); *Equine Holdings LLC v. Auburn Woods LLC*, 2021 UT App 14, ¶ 26, 482 P.3d 880 ("If only one side, and not the other, advances an interpretation that can be considered reasonable, then the language at issue is not ambiguous, because it is subject to only one reasonable interpretation."). When the Agreement was executed in 1996, the general partners had authority to sell Partnership property, including the Property, in

their "absolute discretion" and without the approval of the limited partners.

B.      The 2013 Legislative Changes Did Not Change the Landscape

¶34    The remaining question, then, is whether our legislature's 2013 amendments to Utah partnership law altered the situation. The Siblings assert that they did, because in their view the drafters of the Agreement intended to incorporate later changes to Utah partnership law into the contract. Dennis and Maria argue to the contrary, asserting that 1996 partnership law applies to govern this dispute, and that the drafters of the Agreement did not intend to give "the Legislature the right to change their agreement" over time. Dennis and Maria have the better of this argument.

¶35    As an initial matter, we must keep in mind the general principle that a contract "contains, implicitly, the laws existing at the time it is completed." *See Beehive Med. Elecs., Inc. v. Industrial Comm'n*, 583 P.2d 53, 60 (Utah 1978); *see also Edwards v. Kearzey*, 96 U.S. 595, 601 (1877) ("[T]he laws which subsist at the time and place of making a contract enter into and form a part of it, as if they were expressly referred to or incorporated in its terms."). In this situation, this principle dictates that the rights and duties of the parties in connection with the Agreement were established in 1996, under the laws then in effect.

¶36    But in this case, we have more than just this general principle to guide us. The drafters of the Agreement specified—quite clearly in our view—that their rights and duties under the Agreement were to be governed by RULPA, the version of Utah partnership law in effect at the time the Agreement was signed. In the Agreement's first substantive section, it recites that "the rights, duties and liabilities of each of the General and Limited Partners" should be "determined under" "the provisions of Utah Code Annotated, Title 48, Chapter 2a (1953, as amended)." And as previously noted, Title 48, Chapter 2a of the Utah Code contained, at that time, Utah's version of RULPA. We interpret

this reference as a specific indication that the drafters of the Agreement intended their rights and obligations to be determined by reference to RULPA, the law on Utah's books in 1996.

¶37 In three other places in the Agreement, the partners specify that the powers of the Partnership's general partners will be governed and potentially limited "by the Uniform Revised Limited Partnership Act as in effect in the State of Utah." We likewise interpret these provisions as a clear reference to RULPA, and as an indication that the partners intended their rights to be determined under RULPA in the form enacted by our legislature and in effect in 1996.

¶38 The Siblings resist this interpretation on two textual grounds. First, they point to the "(1953, as amended)" parenthetical in the Agreement's first substantive section, and assert that this reference indicated the partners' preference to be governed by developing Utah partnership law, "as amended" in the future. We consider this a strained interpretation of the contractual text. The entire Utah Code was re-codified in 1953. *See Utah Legal Resources: Utah Statutes*, University of Utah Law Library, https://campusguides.lib.utah.edu/c.php?g=160666&p=1051078 [https://perma.cc/ERY8-NBZQ] (stating that "the last time the Utah Code was re-codified was in 1953," and that, "[a]s a result, the current Utah Code is referred to as the '1953 Code'"); *see also* Mari Cheney, *Utah Legislative History Research Tips*, 21 Utah B.J. 31, 31 (2008) (stating that "[t]he Utah Code Annotated was completely recodified in 1953"); *cf., e.g.*, Utah Code Ann. § 48-2a-102 (Michie 1996) (noting that the provisions of Title 48, Chapter 2a were first enacted, in that codification, in 1953). In our view, the parenthetical identified by the Siblings does nothing more than specify that the statute governing the parties' rights under the Agreement is Title 48, Chapter 2a, as found in the 1953 Code and as amended between 1953 and 1996.

¶39 Second, the Siblings point to the "as in effect" language in the other three statutory references, and argue that this language indicates a preference by the parties to be bound by Utah

partnership law, however it was "in effect" in the future. But this is also a strained interpretation. It ignores key words in the statutory references, such as the words "Uniform" and "Revised," as well as the words "in the State of Utah" that follow "as in effect." And the entire reference, viewed holistically, seems to us to have a rather apparent meaning: the parties wanted their rights and duties governed by RULPA, a uniform law, as that law had been passed by the Utah legislature (as opposed to the raw uniform law proposed by the Commission, and as opposed to a version of the uniform law that may have been enacted in some other state). In our view, this language is not at all indicative of an intention to have the parties' rights and obligations under the Agreement float indeterminately with unknown and unforeseeable future legislative changes.[6]

¶40  Thus, the Agreement quite clearly sets forth the parties' intention to have their rights and obligations under the Agreement set by a specific law—RULPA, codified at Title 48, Chapter 2a of the Utah Code—that was in effect at the time the Agreement was executed. And as discussed, that law did not require general partners to seek the input of limited partners about anything other than voluntary dissolution. Accordingly, the passage of ULPA in 2013, and the associated gradual repeal of RULPA, had no effect on LaVern's established right, as the sole

---

6. It is worth noting that these parties, in drafting the Agreement, knew how to specify that their rights would be governed by changing law in the future. In Section 9.5 of the Agreement, the parties agreed that their partnership allocations, for tax purposes, would be made "in accordance with Section 706(c)(2) of the Internal Revenue Code of 1986, as amended, *or the corresponding provisions of any future United States Internal Revenue law*." (Emphasis added.) The parties did not use similar language in describing their view of Utah partnership law.

remaining general partner, to take the actions authorized by Section 7.3 of the Agreement.[7]

CONCLUSION

¶41   There are several aspects to this multifaceted family dispute, and we resolve only one of those in this interlocutory appeal. We conclude that LaVern had the authority, pursuant to the Agreement, to enter into the Option Contract without first seeking the consent or approval of the limited partners, and that the district court erred in concluding otherwise. We therefore reverse the court's grant of the Siblings' motion for partial summary judgment, and we remand this case with instructions for entry of an order granting partial summary judgment in favor of Dennis and Maria on the authority issue, and for other additional proceedings consistent with this opinion.

———————

7. Moreover, even if post-2013 partnership law were somehow applicable here, the relevant provisions of that law only set default rules that parties could vary in their partnership agreements. *See* Utah Code Ann. § 48-2e-112(2) (LexisNexis 2015). These parties did that here, at least with regard to the power of general partners to take certain actions without first obtaining the consent of limited partners, by agreeing to the specific terms of Section 7.3. And in any event, the 2013 law contains a "savings clause" that makes clear that it "does not affect" any "right accrued before" the new law took effect. *See id.* § 48-2e-1204 (2013). The general partners' rights under this Agreement, including their authority to take action without first seeking the approval of the other partners, accrued in 1996 when the Agreement was signed. For these additional reasons, the 2013 legislative changes do not alter these parties' rights and duties under the Agreement, as established in 1996.