**2019 UT App 61**

## THE UTAH COURT OF APPEALS

KB SQUARED LLC,
Appellant,
*v.*
MEMORIAL BUILDING LLC,
Appellee.

Opinion
No. 20170807-CA
Filed April 18, 2019

Third District Court, Salt Lake Department
The Honorable Barry G. Lawrence
No. 130905407

James L. Barnett, Darren G. Reid, and Steven M. Lau,
Attorneys for Appellant

James K. Tracy, Joshua L. Lee, and James C.
Dunkelberger, Attorneys for Appellee

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES GREGORY K. ORME and DIANA HAGEN concurred.

APPLEBY, Judge:

¶1     KB Squared LLC dba Park City Live (PCL), entered into a lease agreement (the Lease) with Memorial Building LLC (Memorial) to operate a nightclub (the Club) including presenting concerts in a building owned by Memorial in Park City, Utah. PCL used an upper-level "bridge" (the Bridge) for high capacity premium concert seating. Out of occupancy and safety concerns Park City ordered PCL to stop using the Bridge in that way. PCL sued Memorial for a breach of the Lease, arguing that its inability to use the Bridge was caused by Memorial's failure to repair it. After a bench trial, the district court ruled Memorial did not breach the Lease. We affirm.

BACKGROUND

¶2     In December 2011, Memorial entered into the Lease with PCL to occupy the Club "for the purpose of [operating a] nightclub, entertainment, and other event use." Before PCL occupied the Club, a prior tenant (Prior Tenant) operated in the space. In 2005, Prior Tenant had the Bridge built inside the Club. The Bridge was intended to connect "the right and left side mezzanine levels of [the Club]." Engineers prepared construction drawings that "reflect[ed] that the Bridge was approximately 42 feet wide and would accommodate a seating area" that could hold "21 people total." The plans showed a standing area behind the seating area, which, the experts at trial calculated, could "accommodate an additional 38 people, for a total occupancy of 59 on the Bridge." "The plans also contained an express occupancy limit of 50 for the Bridge addition for egress purposes." Based on the testimony presented at trial the district court ruled that "it was reasonable, based upon the intended use of the Bridge, that it was designed to hold between 50 and 60 people for the stated and intended use—i.e., fixed seating and standing for a restaurant or nightclub."

¶3     The district court found the testimony regarding Prior Tenant's use of the Bridge after it was constructed "somewhat unspecific about the precise number of people that [Prior Tenant] housed on the Bridge." But the court concluded "[Prior Tenant] used the Bridge in a manner that appears to have exceeded the stated limit set forth in the plans." At one point, Prior Tenant also used the Bridge "to accommodate [concert] equipment."

¶4     The Lease did not contain "any representation or guaranty concerning the occupancy of the [Club], or any part thereof" nor "any representation or guaranty concerning the manner of use of any particular part of the [Club]." But the Lease generally provided that the Club as a whole was to be used as a nightclub. Prior to entering into the Lease, PCL did not

investigate the purpose for which the Bridge was designed. PCL intended to use the Bridge for "premium event seating" in the same way it believed Prior Tenant used it.

¶5    In January 2013, Park City officials "observed 85 to 100 people . . . dancing and jumping" on the Bridge and observed "excessive deflection of the floor." Because of this, the officials requested that PCL "limit[] the occupancy of the Bridge to 35." "They came back the following night and again observed 80–85 people on the Bridge." After PCL failed to follow the officials' directives, the officials "believed PCL could not control the occupancy load, [and] issued [a] 'Stop Work'[1] order prohibiting any occupancy on the Bridge until otherwise approved."

¶6    PCL contacted the engineers involved in the construction of the Bridge and had them inspect it. The engineers concluded the Bridge was structurally sound. Their report stated that "[t]he original intent of [the Bridge] was to serve as an access platform to mount lighting and sound equipment. In the construction documents, the drawings indicate a value of 50 persons (attributed to [the Bridge] area) used to calculate the means of egress width." The report also noted, "Recently, it has become apparent that the usage of [the Bridge] (under new ownership) has been changed to an assembly area without fixed seats." The engineers recommended that to "prevent excessive deflection/vibration of [the Bridge] under the new usage, . . . the maximum occupant load of [the Bridge should be reduced] to 25 persons." But the engineers also believed "the structural integrity of [the Bridge] system [was] not compromised" and was still fit for its intended purpose.

---

1. Although no work was under way on the Bridge, in a deposition, one of the officials described a "stop work" order as "basically a . . . do-not-enter, unsafe-to-occupy notice."

¶7     PCL asked Memorial to "restore the seating area to its former and promised use as premium event seating as required by the Lease." Memorial refused, noting that the city officials' directives resulted from PCL's misuse of the Bridge, not from its condition, and that the Bridge was structurally sound and undamaged.

¶8     PCL sued Memorial, alleging that it breached the Lease. The claims arose "out of [an] alleged representation that Memorial made in the Lease" that the Bridge was intended to be used as premium event seating. PCL asserted Memorial breached the Lease by failing "to make the structural repairs necessary to enable PCL to use [the Bridge] accordingly."

¶9     After a bench trial, the district court dismissed PCL's claim. It first noted that "PCL [did] not argue that the representation included a specific number of seats, or a specific occupancy number. Instead, it [asked] the Court to conclude that 50 would be a 'reasonable' occupancy number." "[I]t is undisputed that the Lease did not contain any express promise concerning the number of permissible occupants on the Bridge, or any specific use of the Bridge."

¶10    At trial, the principal of PCL (PCL Principal) testified that Memorial made no oral representations or guarantees to PCL regarding how the Bridge was to be used. PCL Principal "believed there was an implicit promise that [PCL] would be able to use the Bridge for nightclub [premium event] seating, which, according to [PCL's] understanding of nightclub industry usage, connotes dancing and jumping." PCL argued Prior Tenant's use of the Bridge should allow PCL to similarly use it because Memorial's Principal (Memorial Principal) was involved in the business when Prior Tenant was using the Bridge and was aware of PCL's intent to use the Bridge in the same manner.

¶11    In PCL's view, the notation "seating area" on the diagram of the Bridge attached to the Lease constituted an implicit

representation. PCL "argue[d] that because the purpose of the Lease was for [it] to operate a 'nightclub,' that 'seating area' actually meant 'premium event seating' which, in the context of a nightclub, essentially means jumping and dancing."

¶12    The court found that PCL's "claim [was] at least 'tenable' . . . [so it] could not interpret the Lease on its face, and had to resort to extrinsic evidence." Accordingly, the court considered the diagram and its reference to "seating area" on the Bridge. The court heard testimony about the diagram and ultimately found that it depicted square footage and was not "intend[ed] to represent or guarantee" an occupancy limit on the Bridge. The court also considered the parties' testimony and found that it was "a stretch—to say the least—that the use of the word 'seating' (taken from a construction document) was understood by everyone to mean a guarantee that the area could be used for dancing and jumping." The court ruled "the facts simply do not preponderate in PCL's favor on . . . its assertions regarding the language of the Lease."

¶13    Specifically, the court noted it was unreasonable for PCL Principal to believe PCL was guaranteed a specific use for the Bridge because, (1) PCL's belief was "based on a strained interpretation of the Lease, and an improper attribution to the attached square footage diagram"; (2) PCL Principal's "understanding of [Prior Tenant's] prior use of the Bridge is not legally relevant"; (3) PCL Principal's "subjective understanding is belied by the lack of any representation from [Memorial Principal]"; (4) "there are provisions in the Lease noting that any prior representations or any representation—if they *had* been made—could not form the basis of an enforceable promise"; and (5) "nothing in the Lease, or the extrinsic evidence relating thereto, defines 'seating' in the manner [PCL Principal] apparently understood it."

¶14    The district court ruled that "because PCL is able to use [the Bridge] for the furtherance of its nightclub operation, and

because there [was] no representation or guarantee of a specific use or occupancy, there is no breach of the terms of the Lease." The court also noted that by misusing the Bridge, PCL caused its own loss. The evidence showed the Bridge was in the same condition as when the Lease was signed and it appeared PCL was requesting that Memorial "*upgrade* [the Bridge], not repair it." Further, "the reason [the Bridge] cannot be used" in the way PCL requested was "based on the fact that Park City" closed it. The closure "was not based on anything Memorial did in violation of its obligations under the Lease."

¶15    The court also awarded Memorial attorney fees under the terms of the Lease, which stated that for any "dispute regarding the terms of the Lease" the "non-prevailing party agrees to reimburse the prevailing party for all expenses and costs, including reasonable attorney fees incurred." The court noted that the fee award "[would] not include the fees and costs incurred by Memorial that did not materially advance its case." It invited Memorial to file a motion and supporting memorandum detailing its request for attorney fees and costs and gave PCL an opportunity to respond. Ultimately the court awarded Memorial approximately half of its total requested fees.

¶16    PCL appeals, arguing that the court was incorrect in interpreting the Lease and also erred in awarding Memorial attorney fees when Memorial failed to "categorize fees as mandated by Utah law."

ISSUES AND STANDARDS OF REVIEW

¶17    PCL raises two issues on appeal, the first of which relates to the Lease. PCL argues the district court erred in finding the Lease ambiguous. Further, it contends the court erred in failing to consider all relevant extrinsic evidence to determine the parties' intent under the Lease and in interpreting the Lease to find PCL was not guaranteed a specific occupancy and use of the

Bridge. "The interpretation of a contract is a question of law, which we review for correctness, giving no deference to the ruling of the district court." *Salt Lake City Corp. v. Big Ditch Irrigation Co.*, 2011 UT 33, ¶ 19, 258 P.3d 539. "Likewise, the determination of whether a contract is facially ambiguous is a question of law, which we review for correctness." *McNeil Eng'g & Land Surveying, LLC v. Bennett*, 2011 UT App 423, ¶ 7, 268 P.3d 854. And we "resolve questions of facial ambiguity in a contract according to the parties' intent, which is a question of fact." *Id.* "If the contract is ambiguous and the [district] court makes findings regarding the intent of the parties, we will not disturb those findings unless they are clearly erroneous." *Allstate Enters., Inc. v. Heriford*, 772 P.2d 466, 468 (Utah Ct. App. 1989).

¶18   The second issue relates to attorney fees. PCL first argues the district court erred in awarding Memorial fees when Memorial failed to categorize its fees as required by Utah law. It also argues the court abused its discretion in awarding Memorial "unreasonable" fees. "Whether the district court applied the correct legal standard is a question of law, which we review for correctness." *Bad Ass Coffee Co. v. Royal Aloha Int'l, LLC*, 2015 UT App 303, ¶ 6, 365 P.3d 161. "Assuming that the district court has applied the correct legal standard," *id.*, "the standard of review on appeal of a [district] court's award of attorney fees is patent error or clear abuse of discretion," *Valcarce v. Fitzgerald*, 961 P.2d 305, 316 (Utah 1998) (quotation simplified).

ANALYSIS

I. The Lease Agreement

¶19   PCL argues the district court erred in concluding the Lease was ambiguous regarding the Bridge's intended purpose because the Lease "expressly represents that the Bridge is to be used as nightclub seating." PCL also contends the court erred in considering extrinsic evidence and made a clearly erroneous

finding that the term "seating area" described on the Lease attachment did not include "dancing and jumping" for a certain occupancy of patrons.

¶20   When interpreting contracts, courts first look to the "writing itself to ascertain the parties' intentions, and . . . consider each contract provision in relation to all of the others, with a view toward giving effect to all and ignoring none." *WebBank v. American Gen. Annuity Service Corp.*, 2002 UT 88, ¶ 18, 54 P.3d 1139 (quotation simplified). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* ¶ 19 (quotation simplified). But "if the language of the contract is ambiguous such that the intentions of the parties cannot be determined by the plain language of the agreement, extrinsic evidence must be looked to in order to determine the intentions of the parties." *Id.* (quotation simplified). If the contract is ambiguous, "[w]e review the [district] court's construction based on extrinsic evidence under the more deferential clearly-erroneous standard." *West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1313 (Utah Ct. App. 1991).

¶21   PCL contends the Lease unambiguously represents the Bridge as a nightclub seating area. The text of the Lease contains no mention of the Bridge or representations regarding its use. Instead, PCL relies on the diagram attached to the Lease, which depicts the floor plan and shows bench seating along the Bridge with the notation "seating area." PCL contends that this notation was a guarantee that the Bridge could be used for premium event seating, including dancing and jumping, for 50 to 80 nightclub patrons. Although the district court found this argument to be "tenable," no such guarantee is evident from the face of the Lease. We agree the Lease is ambiguous and that the district court properly considered extrinsic evidence to interpret its terms.

¶22 "A party challenging the [district] court's interpretation of ambiguous terms of a contract faces a substantial appellate burden." *Id.* We will "affirm the [district] court's findings if they are based on sufficient evidence, viewing the evidence in the light most favorable to the court's construction." *Id.* In this case, the district court properly considered the extrinsic evidence. First it looked to the diagram attached to the Lease, which included the term "seating area" in reference to the Bridge. The court found the "evidence was clear" that this diagram "was taken from a prior construction document only for the *purpose of identifying the square footage* of [the Club]." The court based this finding on the reference to the diagram in the Lease itself, the square footage calculation on the diagram, the underlying correspondence regarding the diagram, and Memorial Principal's testimony regarding why the parties included the diagram as an attachment to the Lease. Based on the evidence presented, the court found "that Memorial did not, by attaching that document, intend to represent or guarantee that that area could be used up to a certain occupancy or for a specific purpose."

¶23 The district court also found that Memorial did not tell PCL Principal during lease negotiations that PCL could use the Bridge as premium event seating to allow scores of people to jump and dance during concerts. "If [PCL Principal] relied upon such a representation she was doing so based upon her subjective understanding, which is insufficient . . . to support her claim." The court said it could not "accept a representation that is simply not made in, or supported by, the Lease or any of the circumstances surrounding its execution" and concluded it was a "leap of logic . . . that 'seating' really means *nightclub dancing*," which includes dancing and jumping, and therefore this assertion was "entirely unsupported and unreasonable."

¶24 The evidence in the record supports the district court's findings. *See Bonnie & Hyde, Inc. v. Lynch*, 2013 UT App 153, ¶ 17, 305 P.3d 196 ("A [district] court's factual findings are clearly

erroneous only if they are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made." (quotation simplified)). PCL points to several pieces of evidence it argues the court should have weighed more heavily, but this court does not reweigh evidence presented at trial. *See In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 ("When a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence.").

¶25   In any event, even if we assume "seating" includes "dancing and jumping," PCL's claim still fails because the Lease does not guarantee high occupancy for the Bridge and therefore Memorial did not breach it. "Whether a party performed under a contract or breached a contract is a question of fact." *Syme v. Symphony Group LLC*, 2018 UT App 212, ¶ 23 (quotation simplified). "A party challenging a district court's factual findings on appeal bears a heavy burden of persuasion." *Dahl v. Dahl*, 2015 UT 79, ¶ 149. "Parties challenging factual findings cannot persuasively carry their burden in this respect by simply listing or rehashing the evidence and arguments they presented during trial or by merely pointing to evidence that might have supported findings more favorable to them." *Shuman v. Shuman*, 2017 UT App 192, ¶ 8, 406 P.3d 258 (quotation simplified).

¶26   The district court noted that "if PCL wanted Memorial to guarantee a specific number of people in a certain area they could have done so, and should have demanded so in the Lease." PCL argues this information would not appear on a lease agreement because occupancy issues are usually decided by city zoning and enforcement officials. But that is precisely what happened here. The city officials saw 85 to 100 individuals dancing on the Bridge and told PCL to limit the number to 35.

¶27   The court also relied on several clauses in the Lease to support its conclusion that Memorial did not breach it. First, the Lease provided that PCL was "taking the property 'as is' and

[acknowledged] . . . that there [had] been a right to an opportunity to inspect the property." Second, the Lease's general purpose was to operate a "nightclub, entertainment, and other event use," not to guarantee PCL a specific occupancy of the Bridge. Finally the Lease contained a provision that stated, "This Lease contains all of the agreements of the parties hereto with respect to matters covered or mentioned in this Lease and no prior agreement, letters, representations, warranties, promises, or understandings pertaining to any such matters shall be effective for any such purpose." Based on these clauses and other evidence presented at trial, the court determined that PCL was not guaranteed a specific occupancy or use of the Bridge and Memorial had not breached any provision of the Lease. The court also noted that the engineers found no structural flaws in the Bridge and that PCL is still able to use it. Significantly, "the evidence was undisputed that the condition of the Bridge is in the same condition it was when the Lease was signed."

¶28 The court concluded "because PCL is able to use the bridge for furtherance of its nightclub operation, and because there is no representation or guarantee of a specific use or occupancy, there is no breach of the terms of the Lease." This finding was not clearly erroneous and therefore Memorial did not breach the Lease.[2]

¶29 We conclude the district court correctly ruled the Lease was ambiguous and that the term "seating area" did not expressly include "dancing and jumping." Further, the court did not clearly err in interpreting the extrinsic evidence to conclude the Lease was not intended to guarantee "dancing and

---

2. Because Memorial did not breach the Lease, PCL is not entitled to damages. *See Christensen & Jensen, PC v. Barrett & Daines*, 2008 UT 64, ¶ 26, 194 P.3d 931 (stating that "in a breach of contract action, the non-breaching party is required to show that the breach proximately caused the damages sought").

jumping." Finally, the court did not clearly err in its determination that Memorial did not breach the Lease by failing to repair the Bridge because the Lease did not guarantee any particular occupancy on the Bridge and PCL is currently able to use the Bridge to advance the general purpose of operating a nightclub.

## II. Attorney Fees

¶30    PCL argues the district court erred when it awarded Memorial attorney fees because Memorial's fees should have been categorized consistent with Utah law. It also argues the court erred in "failing to address unreasonable fees requested by Memorial."

¶31    "In Utah, attorney fees are awardable only if authorized by statute or by contract. If provided for by contract, the award of attorney fees is allowed only in accordance with the terms of the contract." *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988) (quotation simplified). The requested fees must also be reasonable and "[a] party who requests an award of attorney fees has the burden of presenting evidence sufficient to support an award." *Cottonwood Mall Co. v. Sine*, 830 P.2d 266, 268 (Utah 1992). The evidence introduced regarding the reasonableness of the attorney fees should address several factors such as,

> the difficulty of the litigation, the efficiency of the attorneys in presenting the case, the reasonableness of the number of hours spent on the case, the fee customarily charged in the locality for similar services, the amount involved in the case and the result attained, and the expertise and experience of the attorneys involved.

*Dixie State*, 764 P.2d at 989 (quotation simplified). The court must then "make an independent evaluation of the reasonableness of the requested fees in light of the parties' evidentiary

submissions." *Crane-Jenkins v. Mikarose, LLC*, 2016 UT App 71, ¶ 5, 371 P.3d 49 (quotation simplified). "An award of attorney fees must be based on the evidence and supported by findings of fact." *Cottonwood Mall*, 830 P.2d at 268.

¶32    In this case, the Lease stated, "In the event of any . . . dispute regarding [the Lease's] terms and conditions or enforcement, the non-prevailing party agrees to reimburse the prevailing party for all expenses and costs, including reasonable attorney's fees incurred in enforcing the terms hereof."

¶33    PCL argues Memorial should have been required to categorize its fees. PCL cites this court's decision in *Crane-Jenkins* to support its position. *Crane-Jenkins* requires a party seeking attorney fees to categorize the time and fees expended for "(1) successful claims for which there may be an entitlement to attorney fees, (2) unsuccessful claims for which there would have been an entitlement to attorney fees had the claims been successful, and (3) claims for which there is no entitlement to attorney fees." 2016 UT App 71, ¶ 21 (quotation simplified). Here, Memorial was awarded fees under a broad Lease provision that allows it to recover any reasonably incurred attorney fees in a dispute related to the terms and conditions of the Lease. Memorial argues that it need not allocate its fees because each of its defenses and counterclaims related to whether it had to repair the Bridge under the Lease.

¶34    We agree with Memorial that when a dispute involves "multiple claims involving a common core of facts and related legal theories, and [a party] prevails on at least some of its claims, it is entitled to compensation for all attorney fees reasonably incurred in the litigation." *Golden Meadows Props., LC v. Strand*, 2010 UT App 257, ¶ 35, 241 P.3d 375 (quotation simplified). Because all of Memorial's defenses and counterclaims related to the same issue of whether it was required to "repair" the Bridge under the Lease, we conclude it was not obligated to separately categorize its fees.

¶35    With respect to the reasonableness of the fees, the district court considered the difficulty of the litigation, the fee customarily charged in the locality for similar services, the amount involved in the case and the result attained, and the expertise and experience of the attorneys involved. It found these factors were not disputed and that they "preponderate[d] in favor of Memorial's request." The court separately, and in detail, discussed the remaining factors of reasonableness in terms of the number of hours spent on the case and the efficiency of the attorneys presenting the case and concluded that "a reasonable amount for Memorial's reasonable and necessary attorney fees and costs incurred in this matter, for which [PCL] should be responsible . . . [totals] $147,714." The court noted, "This amount represents a *reasonable approximation* of fees and costs." The court relied on *Alexander v. Brown*, which affirmed a district court's award of attorney fees where the district court chose the middle ground between two estimates, a compromise between the amounts suggested by counsel for each side of what were reasonable fees. 646 P.2d 692, 695 (Utah 1982).

¶36    The court also specifically excluded certain fees it found unreasonable, which included "all costs and fees incurred in filing [Memorial's] failed dispositive motions," the "costs associated with [two of] Memorial's experts" because the court "found their testimony to be unhelpful," and "the costs associated with [Memorial's] defense of [PCL's] damage theory" because the court found in favor of Memorial and did not award PCL damages. And, as previously noted, the court ultimately awarded Memorial considerably less than the amount it requested. We conclude the district court did not abuse its discretion in awarding Memorial its reasonable attorney fees.[3]

---

3. We also note that PCL has not identified a specific fee entry that was improperly awarded by the district court.

¶37 Finally, both parties request attorney fees incurred on appeal. "A party entitled by contract or statute to attorney fees below and that prevails on appeal is entitled to fees reasonably incurred on appeal." *Federated Capital Corp. v. Abraham*, 2018 UT App 117, ¶ 15, 428 P.3d 21 (quotation simplified). The district court awarded Memorial attorney fees below pursuant to the Lease. Because Memorial has prevailed on appeal, we award it reasonable attorney fees incurred on appeal.

## CONCLUSION

¶38 The district court did not err in determining that the Lease's use of the phrase "seating area" did not include "dancing and jumping." Neither did it err in finding Memorial did not breach the Lease. Finally, the court did not abuse its discretion in awarding Memorial its reasonably incurred attorney fees, and we therefore award Memorial its fees reasonably incurred on appeal. We remand for the limited purpose of determining reasonable attorney fees incurred by Memorial in connection with defending the court's ruling on appeal.

_____