2023 UT App 97

## THE UTAH COURT OF APPEALS

ARTHUR W. COCKS AND JULIE L. COCKS,
Appellees,
*v.*
SWAINS CREEK PINES LOT OWNERS ASSOCIATION,
Appellant.

Opinion
No. 20200961-CA
Filed August 24, 2023

Sixth District Court, Kanab Department
The Honorable Marvin D. Bagley
No. 170600114

Bruce C. Jenkins, Kimball A. Forbes, and
Kathryn Lusty, Attorneys for Appellant

J. Bryan Jackson, Attorney for Appellees

JUSTICE JILL M. POHLMAN authored the lead opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.[1]
JUDGE RYAN D. TENNEY authored a concurring opinion, in which
JUDGE RYAN M. HARRIS concurred.

POHLMAN, Justice:

¶1      Swains Creek Pines Lot Owners Association appeals the
district court's judgment in which it ruled that Arthur and Julie
Cocks are entitled to continue using their two lots "for RV

---

1. Justice Jill M. Pohlman began her work on this case as a member
of the Utah Court of Appeals. She became a member of the Utah
Supreme Court thereafter and completed her work on the case
sitting by special assignment as authorized by law. *See generally*
Utah R. Jud. Admin. 3-108(4).

purposes until such time as there is a change of use." We reverse, vacate, and remand for further proceedings.

BACKGROUND[2]

¶2      The Cockses, as trustees of the Cocks Family Trust, own two lots in the subdivision known as Swains Creek Pines Unit No. 3 (the subdivision), located in Kane County, Utah.[3] When they acquired the lots via warranty deed in July 2014, the lots consisted of "undisturbed mountain forest land." They later placed an RV on their lots.

¶3      The Cockses' interest in the lots is subject to the subdivision's conditions, covenants, reservations, and restrictions (the CC&Rs). The Swains Creek Pines Lot Owners Association (the Association) is a nonprofit corporation that, through its board of directors (the Board), has controlled the enforcement of the CC&Rs since 1998. The Association also has adopted written guidelines, rules, and regulations applicable to the larger Swains Creek Pines community. One of those rules—Rule 16—provides, "All *structures, including* cabins, *trailers*, garages, sheds, decks, stairs, shelters, etc. shall be kept in safe and good repair." (Emphases added.)

¶4      Sometime after the Cockses purchased the lots, controversy arose among some lot owners over the placement of RVs and trailers (collectively, RVs) on the lots in the subdivision.

---

2. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *Grimm v. DxNA LLC*, 2018 UT App 115, ¶ 2 n.1, 427 P.3d 571 (cleaned up).

3. The Cocks Family Trust is the record owner of the two lots, but for simplicity we refer to the Cockses as the owners.

Some owners used, or supported the placement of, RVs on at least some of the lots. Other owners opposed RV use and instead supported the use of all lots "for cabins only." Both sides demanded that the Board "take action."

¶5      In response, the Board enacted a resolution in October 2016 (the 2016 resolution) stating that the CC&Rs "do not allow for placement of RV's on lots" within the subdivision.[4] In support of its conclusion, the Board cited paragraph 1 of the CC&Rs, which states that the lots "are for single-family residential purposes only" and are to be used and "held in such a way as to preserve and enhance their pastoral, scenic beauty as mountain cabin residential recreational sites." Notably, paragraph 1 further states, "No improvement or structure whatever, other than a first class private dwelling house, patio walls, swimming pool, and customary outbuildings, garage, carport, servants' quarters, or guest house may be erected, placed, or maintained on any lot in [the subdivision]."

¶6      Despite its conclusion that the CC&Rs do not allow for the placement of RVs on lots within the subdivision, the Board adopted an enforcement policy in the 2016 resolution to address the lot owners who had already placed RVs on their lots. Specifically, as a "compromise," the Board resolved that the Association would not "pursue enforcement action" against current owners of "[p]rior [n]on-conforming [l]ots" and that RVs could remain on those lots until their current owners sold the lots to someone other than an immediate family member. Thus, under

---

4. For purposes of the 2016 resolution, the Board defined a "recreational vehicle" or "RV(s)" as "a motor vehicle or trailer equipped with living space and amenities found in a home which may include a kitchen, bathroom, bedroom, living room, water and sewer; including, but not limited to, a camp trailer, motor home, travel trailer, fifth wheel trailer, pop up trailer, and slide-in camper."

the 2016 resolution, the Cockses were allowed to keep the RV already placed on their lots, but they could not sell their lots for RV use to an unrelated third party.

¶7    In November 2017, the Cockses filed suit against the Association, challenging the Board's interpretation of the CC&Rs that led to its adoption of the 2016 resolution.[5] Believing that their lots were more valuable as lots that allow RV use rather than as lots restricted to cabin use, the Cockses sought, among other things, a declaratory judgment "construing the CC&Rs" "to allow for the use of trailers and RVs."

¶8    The Cockses also asserted that they were harmed by the 2016 resolution's enforcement compromise, preferring that the Board adopt a change-in-use standard rather than the standard involving a sale to an unrelated third party. Under a change-in-use standard, the Cockses would be able to sell the lots for RV use not only to family members but also to third parties. In response to the lawsuit, the Association asserted affirmative defenses, including that a statutory business judgment rule barred some or all of the Cockses' claims.

¶9    The Association eventually sought summary judgment on the ground that the plain language of the CC&Rs did not allow for the lots within the subdivision "to be used as RV/trailer lots." The Cockses countered that the Association's plain language argument was undermined by the CC&Rs' lack of express language prohibiting RV use and by the Association's history of permitting the placement of RVs on subdivision lots. The district court denied summary judgment and reserved for trial "any issues concerning the plain language of the CC&Rs and the

---

5. The Cockses also named as defendants the individual members of the Board. The Cockses ultimately stipulated to the entry of summary judgment dismissing their claims against the board members.

Association's past course of dealing." The matter then proceeded to a three-day bench trial, after which the court issued a written decision.

¶10 As to the question of whether the CC&Rs allow or preclude RV use, the district court rejected the Association's position that the CC&Rs unambiguously prohibit RVs in the subdivision. The court reasoned that "nothing in the CC&Rs . . . expressly prohibits RV use"; rather, the language in the CC&Rs "is ambiguous as to whether RV use is prohibited." It explained that the use of the word "cabin" in paragraph 1 of the CC&Rs "does not expressly exclude RVs or trailers," nor does the phrase "first class private dwelling house." Indeed, "[t]he words 'RV' or 'trailer' are not even used . . . in paragraph 1." The court also deemed it significant that "such words were not included in the sentence which prohibits what can 'be erected, placed or permitted or maintained' in the subdivision."

¶11 The district court then turned its attention to the evidence presented at trial regarding the historical use of RVs on lots in the subdivision. The court noted that the Cockses presented testimony from association members who had placed RVs on their lots since the 1970s. Those members testified that they did so "for long periods of time . . . without ever being told or confronted by board members that they could not make such use of their property." Further, some members recounted that "they had specifically been told by realtors, contractors, association members and board members[] that RV use was allowed." In contrast, the Association presented testimony from other members "who were insistent they had been told by everyone concerned that all lots in [the subdivision] were limited to cabin development," which they understood as "stick built structures from the ground up, placed on a foundation." The court ultimately found that buyers and owners "were told what they wanted to hear" relative to RV use in the subdivision. It also found that the Association "was fully aware" of these conflicting

messages and that the Association's position was the CC&Rs "allowed RV use on lots owned by lot owners who supported RV use" and the CC&Rs "prohibited RV use on lots owned by lot owners opposed to RV use."

¶12    Regarding enforcement, the district court noted that some former board members testified that the Association "took no action to prevent the use of lots for RV purposes." The court found that "this lack of enforcement action" was "consistent with the interpretation that the CC&Rs allow RV use." The court further reasoned that the Association's "inconsistency" regarding whether the CC&Rs prohibited or allowed RV use "supports the Court's finding of ambiguity" in paragraph 1 of the CC&Rs.

¶13    With this evidence in mind, the court next addressed the Cockses' contention that the Association had waived any right it may have had to enforce the CC&Rs to preclude RV use. In response to that argument, the Association had insisted that the court could not find waiver because there was no evidence that the Association had intentionally chosen not to enforce the RV prohibition. The Association also cited an antiwaiver clause in paragraph 22 of the CC&Rs, which provides that the Association has the right to compel compliance with the CC&Rs but that "[n]o delay or omission on the part of the [Association] . . . in exercising any rights, power, or remedy herein provided, in the event of any breach of [the CC&Rs] . . . , shall be construed as a waiver thereof or acquiescence therein."[6]

---

6. More precisely, the antiwaiver clause provides that the "reversionary owner"—the original developer—has the right to compel compliance. Evidence was presented at trial, and the parties appear to agree, that before the relevant events in this case, the original developer assigned its reversionary-owner rights to the Association.

¶14 Without addressing the antiwaiver clause, the district court rejected the Association's counterargument on the grounds that "it comes too late" and that the Cockses "were entitled to rely upon the interpretation of the CC&Rs the association adopted prior to the adoption of the . . . 2016 resolution." The court explained that ever since the Cockses purchased their lots, they had been allowed to place an RV on them and could have "sold their property, for RV use, to someone outside their immediate family," but that the Association is "taking those rights away" under a "new interpretation of the CC&Rs." The court determined that the Association "cannot now change horses in mid stream to deprive [the Cockses] of the full use of their property."

¶15 Finally, the court addressed the Association's business judgment rule defense rooted in Utah Code section 57-8a-213. The court determined that the statute provides the Association "with the authority it claims for *prospective* application of the board's interpretation" of the CC&Rs. But the court determined that the statute "does not provide the authority to adversely affect the rights [the Cockses] have enjoyed (with the [A]ssociation's tacit approval) since they purchased their property." It concluded that the Cockses' rights were "established" under the Association's earlier interpretation of the governing documents that RV use was allowed. And based on the court's determination that the 2016 resolution "constitutes a change to the governing documents," it determined that, in enacting the resolution, the Board "was not using its best judgment to determine whether to pursue enforcement" against the Cockses. Thus, the court ruled that the Board's enforcement of its interpretation of paragraph 1 of the CC&Rs "going forward is a reasonable exercise of business judgment" but that the Board's reversal of its prior position adversely impacted the Cockses' rights and so was "arbitrary, capricious and against public policy" as it relates to them.

¶16 The district court ultimately entered a judgment and decree, which included two orders. First, it ordered that the

Cockses are entitled to continue to use their lots in the subdivision "for RV purposes until such time as there is a change of use." Second, it authorized the recording of the 2016 resolution "to give notice to future interest holders of the Association's interpretation of its governing documents including the CC&Rs, for [prospective] application and imparting notice to current and future lot owners, board members, realtors and contractors of the same for the future."

¶17    The Association appeals.


ISSUES AND STANDARDS OF REVIEW

¶18    The Association first contends that the district court erred in determining that the CC&Rs are ambiguous about whether RVs are allowed to be placed on lots in the subdivision. "The determination as to whether a written instrument is ambiguous is a question of law . . . ." *Equine Holdings LLC v. Auburn Woods LLC*, 2021 UT App 14, ¶ 25, 482 P.3d 880 (cleaned up), *cert. denied*, 496 P.3d 715 (Utah 2021). We thus review the district court's decision on ambiguity for correctness. *See Brady v. Park*, 2019 UT 16, ¶ 57, 445 P.3d 395.[7]

¶19    Next, the Association argues that the district court erred in its application of the business judgment rule by failing to presume that the Board acted reasonably in adopting the 2016 resolution regarding enforcement of the CC&Rs' prohibition against RV use.

---

7. The Association also contends that "the clear weight of the extensive evidence at trial supported finding the intent of the contracting parties was to prohibit RVs in" the subdivision. We need not reach this argument, however, because based in part on the Cockses' view that RVs are "structures" within the meaning of paragraph 1 of the CC&Rs, *see infra* ¶ 28, we agree with the Association that the CC&Rs unambiguously prohibit RV use.

We review the court's decision for correctness. *See Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶¶ 15, 26 & n.12, 27, 379 P.3d 1218.

¶20     Last, the Association asserts that the district court's waiver analysis is flawed. "Whether the district court applied the correct legal standard is a question of law, which we review for correctness." *KB Squared LLC v. Memorial Bldg. LLC*, 2019 UT App 61, ¶ 18, 442 P.3d 1168 (cleaned up).

ANALYSIS

I. Ambiguity

¶21     The Association challenges the district court's determination that the CC&Rs are ambiguous, arguing that the plain language of the CC&Rs unambiguously prohibits RV use on subdivision lots. Pointing to paragraph 1 of the CC&Rs, the Association argues that an RV is "not one of the permitted structures." In its view, because the paragraph "prohibits any improvement or structure except for those" listed and because "an RV is not in that list," paragraph 1 "unambiguously prohibits RVs from being placed on any lot in" the subdivision. It also complains that the district court "improperly allowed extrinsic evidence to find ambiguity."

¶22     The Cockses respond that the district court "was correct to find the CC&Rs ambiguous." Pointing out that RVs "are not found in the express wording of the CC&Rs," they assert that the CC&Rs therefore do "not attempt to exclude RVs" from the permitted "structures such as patios, carports, or guesthouses." They also suggest that the term "first class private dwelling house" should be construed to "not exclud[e]" RVs because that term "is not defined" in the CC&Rs. The Cockses further assert

that "extrinsic evidence," including Rule 16, "supports [their] interpretation."

¶23 "Restrictive covenants are a method of effectuating private residential developmental schemes and give property owners in such developments the right to enforce those covenants against others in the development." *Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 19, 379 P.3d 1218 (cleaned up). To this end, restrictive covenants "form a contract between subdivision property owners as a whole and individual lot owners." *Swenson v. Erickson*, 2000 UT 16, ¶ 11, 998 P.2d 807. Thus, the interpretation of restrictive covenants is "governed by the same rules of construction as those used to interpret contracts," and "generally, unambiguous restrictive covenants should be enforced as written." *Fort Pierce*, 2016 UT 28, ¶ 19 (cleaned up); *accord Equine Holdings LLC v. Auburn Woods LLC*, 2021 UT App 14, ¶¶ 21, 25, 482 P.3d 880, *cert. denied*, 496 P.3d 715 (Utah 2021); *UDAK Props. LLC v. Canyon Creek Com. Center LLC*, 2021 UT App 16, ¶ 14, 482 P.3d 841, *cert. denied*, 509 P.3d 768 (Utah 2022).

¶24 "When we interpret a contract, we start with its plain language." *Willow Creek Assocs. of Grantsville LLC v. Hy Barr Inc.*, 2021 UT App 116, ¶ 41, 501 P.3d 1179 (cleaned up). And "our analysis is guided by the ordinary and usual meaning of the words." *Id.* ¶ 42 (cleaned up).

¶25 Like a contractual provision, a restrictive covenant is ambiguous if it is "capable of more than one *reasonable* interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *See Brady v. Park*, 2019 UT 16, ¶ 54, 445 P.3d 395 (cleaned up). "[A] reasonable interpretation is an interpretation that cannot be ruled out, after considering the natural meaning of the words in the . . . provision [at issue] in context of the [writing] as a whole, as one the parties could have reasonably intended." *See id.* ¶ 55.

¶26   "Crucially, ambiguity is present only if *both* proffered interpretations of the [writing's] language are tenable and in keeping with the [writing's] language." *See Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 23, 474 P.3d 481 (cleaned up). "Terms are not ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 (cleaned up).

¶27   The resolution of the ambiguity question here turns on paragraph 1 of the CC&Rs, which provides as follows:

> 1. RESIDENTIAL USE. Each and all of said lots are for single-family residential purposes only and are not subject to further subdivision or partition by sale; said lots to be used, built upon, improved and held in such a way as to preserve and enhance their pastoral, scenic beauty as mountain cabin residential recreational sites free from unsightly neglect or abuse. No building or structure intended for or adapted to business purposes, and no apartment house, double house, lodging house, rooming house, hospital, sanatorium or doctor's office or other multiple-family dwelling shall be erected, placed, permitted, or maintained on such premises, or on any part thereof. No improvement or structure whatever, other than a first class private dwelling house, patio walls, swimming pool, and customary outbuildings, garage, carport, servants' quarters, or guest house may be erected, placed, or maintained on any lot in [the subdivision].

The district court determined that paragraph 1 of the CC&Rs is ambiguous, that is, that it may be interpreted in two reasonable ways. On this record and given the positions the parties have

taken during this litigation, we disagree with the court's determination.

¶28    To begin, both sides agree that RVs are "structures" within the meaning of paragraph 1. The Association acknowledges that "linguistically, an RV can be a structure" and asserts that an RV is "not one of the permitted structures" under paragraph 1. And the Cockses similarly accept that RVs qualify as structures as that term is used in the CC&Rs, asserting that because the phrase "first class private dwelling house" in context "does not attempt to exclude RVs or trailers from structures such as patios, carports, or guesthouses," the "only exclusion found in this paragraph pertains to buildings and structures intended for or adapted to business purposes." This position is consistent with the Cockses' insistence throughout this dispute that Rule 16's definition of permissible "structures"—a definition that includes "trailers"—provides extrinsic support for their proffered interpretation of paragraph 1. *See supra* ¶ 3. Based on the parties' shared understanding, RVs fall within the scope of the structures addressed in paragraph 1.[8]

¶29    On the one hand, we first conclude that the Association's interpretation of paragraph 1—a reading that prohibits RV use—is reasonable. As the Association correctly points out, RVs are not expressly listed as one of the improvements or structures that may be placed on subdivision lots. The most pertinent language of paragraph 1 states, "No improvement or structure whatever, other than a first class private dwelling house, patio walls, swimming pool, and customary outbuildings, garage, carport, servants' quarters, or guest house may be erected, placed, or maintained on any lot in such premises."

---

8. By holding the parties to their agreement in this regard, we do not—as a strictly linguistic matter—necessarily endorse that interpretation of "structures."

¶30    Put more simply, this key last sentence provides that "[n]o . . . structure whatever, other than" several listed things, may be "erected, placed, or maintained" on a lot in the subdivision. "Other than" means "except for." *Other than*, Merriam-Webster, https://www.merriam-webster.com/dictionary/other%20than [https://perma.cc/664T-G528]. Again, the parties agree that RVs qualify as structures. Because no structures are allowed except for the listed things and because RVs are not listed, we thus agree with the Association that the CC&Rs can reasonably be read to exclude RVs as a permissible use.

¶31    On the other hand, we next conclude that—given their position that RVs qualify as structures—the Cockses have *not* proposed a tenable alternative interpretation of the language of the CC&Rs. Rather, like the district court, the Cockses focus on how RVs "are not found in the express wording of the CC&Rs," and they infer from this omission that the CC&Rs do not exclude RV use in the subdivision. But we agree with the Association that the failure in paragraph 1 "to prohibit RVs by name . . . is not the same thing as allowing RVs." Indeed, the Cockses' proposed reading overlooks that the omission of RVs from paragraph 1's last sentence of allowed structures cuts against their position. Neither the district court nor the Cockses grappled with the Association's interpretation or provided a textual analysis to explain why paragraph 1 does not exclude RVs from permissible uses.

¶32    Instead, the Cockses suggest that a "first class private dwelling house," which is an allowed structure under paragraph 1, encompasses any non-business structure, including RVs. But they offer no basis for us to conclude that the natural meaning of the words "first class private dwelling house" includes an RV. A "house" is generally understood to refer to "a building in which something is sheltered or stored" or "a building that serves as living quarters for one or a few families." *House*, Merriam-Webster, https://www.merriam-webster.com/dictionar

y/house [https://perma.cc/WVN6-XMEF]. In contrast, an RV is a recreational vehicle—it is not a building. Thus, even if RVs provide shelter and living quarters like a house does, we fail to see how the term "first class private dwelling house" would be intended to include vehicles like an RV.[9] As a result, and given their acknowledgment that RVs are structures, the Cockses have not shown an alternative interpretation of the CC&Rs that is both reasonable and "in keeping with the [writing's] language." *See Ocean 18 LLC*, 2020 UT App 54, ¶ 23. Where only one party's interpretation of a writing is reasonable, the writing is not ambiguous. *See Equine Holdings*, 2021 UT App 14, ¶ 26. That is the case here. The district court therefore erred in determining that the CC&Rs are ambiguous.

¶33     Still, the Cockses assert that "extrinsic evidence supports [their] interpretation" that RVs are permitted. The district court similarly relied on extrinsic evidence to bolster its conclusion that the CC&Rs were ambiguous. When a writing is ambiguous, "the ambiguity must be resolved by considering extrinsic evidence of the parties' intent." *Brady*, 2019 UT 16, ¶ 53. But "if a [writing] contains no ambiguity, the court will not consider extrinsic evidence and will enforce the [writing] according to its terms." *See Brodkin v. Tuhaye Golf, LLC*, 2015 UT App 165, ¶ 18, 355 P.3d 224 (cleaned up). Because we agree with the Association that the

---

9. These definitions, and our conclusion, are consistent with Mr. Cocks's understanding of the plain meaning of the relevant terms. Mr. Cocks testified during his deposition that a "house," as that term is used in the CC&Rs, is "[a] permanent structure on a foundation" and that an RV "wouldn't be a house . . . because it's not a permanent structure on a foundation." Mr. Cocks also testified to his belief that an RV would not have been considered a "first class private dwelling house" when the CC&Rs were drafted in 1977.

CC&Rs are not ambiguous, we further agree with the Association that the court had no need to consider extrinsic evidence.[10] *See id.*

¶34    In short, we agree with the Association that the CC&Rs are unambiguous because, given the language of the CC&Rs and the parties' agreement that RVs are structures, the CC&Rs are not "susceptible to two . . . reasonable interpretations" about whether they allow for the placement of RVs on lots in the subdivision. *See Swenson*, 2000 UT 16, ¶ 11. Accordingly, we agree with the Association's position that the CC&Rs unambiguously prohibit RV use. We thus reverse the district court's judgment and order, and we remand for further proceedings.

## II. Business Judgment Rule

¶35    Next, the Association contends the district court erred in analyzing the business judgment rule. Utah Code section 57-8a-213, the source for the business judgment rule asserted here, provides that the board of a homeowner association "shall use its reasonable judgment to determine whether to exercise the association's powers to impose sanctions or pursue legal action for a violation of the governing documents," including "whether to compromise a claim made by or against the board or the association." Utah Code § 57-8a-213(1)(a)(i). It further states, in relevant part, that "[t]he association may not be required to take enforcement action if the board determines, after fair review and acting in good faith and without conflict of interest, that under the particular circumstances" "a technical violation has or may have

---

10. "But if a party contends that an apparently unambiguous [writing] contains a latent ambiguity, as opposed to a facial ambiguity, the court will consider extrinsic evidence to determine whether the [writing] contains a latent ambiguity." *See Grove Bus. Park LC v. Sealsource Int'l LLC*, 2019 UT App 76, ¶ 17 n.3, 443 P.3d 764 (cleaned up). Here, the parties do not contend that the CC&Rs contain a latent ambiguity, rendering this exception inapposite.

occurred" and "the violation is not material as to a reasonable person or does not justify expending the association's resources," or if the board determines that "it is not in the association's best interests to pursue an enforcement action, based upon hardship, expense, or other reasonable criteria." *Id.* § 57-8a-213(1)(b)(iii)–(iv). And "in taking or not taking enforcement action," the board's decision "may not be arbitrary, capricious, or against public policy." *Id.* § 57-8a-213(3).

¶36   A dispute over the business judgment rule arose when the Association invoked it defensively, asserting that the 2016 resolution was "a valid exercise of business judgment." The 2016 resolution declared that although the CC&Rs "do not allow for placement of RV's on" subdivision lots, the Association would not "pursue enforcement action" against "[p]rior [n]on-conforming [l]ots" and that RVs could remain on those lots until their current owners sold the lots to someone other than an immediate family member.

¶37   The district court ruled that the Board's action "going forward is a reasonable exercise of business judgment" but that the Board's action vis-à-vis the Cockses was "arbitrary, capricious and against public policy." It reasoned that the Board's position as stated in the 2016 resolution was improper because it reflected "a change to the governing documents" that adversely impacted the Cockses' rights.

¶38   On appeal, the Association contends that the district court misapplied the business judgment rule by "not afford[ing] the Board the appropriate level of deference to its judgment in enforcing the CC&Rs." According to the Association, the 2016 resolution "did not change the CC&Rs" but, instead, "simply put[] the Board back into a posture of enforcing the CC&Rs as written." And by adopting the 2016 resolution, "the Board used its business judgment to forgo enforcement of the RV prohibition in the CC&Rs against current owners with RVs on their lots until

the Resolution's triggering event [of] an owner's sale of a lot to [an] unrelated third party . . . and to enforce the RV prohibition against future owners."[11] The Association asserts that the court erred by substituting its judgment for the Board's "by replacing the triggering event" with a change of use, which means "that the Cockses are allowed an RV until they or a future owner, related or not, stop placing RVs" on their two lots. The Cockses respond that the court "has not acted arbitrarily or capriciously," arguing that the exercise of the business judgment rule "does not justify changing the CC&Rs."

¶39   We reverse the district court's determination that the Board's adoption of the 2016 resolution was "arbitrary, capricious and against public policy" as enforced against the Cockses. The court's decision relative to the business judgment rule was based on its view that the 2016 resolution "constitutes a change to the governing documents." In other words, the court's ruling regarding the 2016 resolution was premised on its conclusion that the CC&Rs were ambiguous and did not, on their face, restrict RV use. Because we have reached the opposite conclusion—we have determined, based on the language of the CC&Rs and the parties' arguments, that the CC&Rs unambiguously prohibit the placement of RVs on the subdivision lots—the 2016 resolution did not constitute a change to the governing documents; rather, it simply reflected the Board's interpretation of existing language in the CC&Rs. Thus, the court's ruling was built on a flawed premise, and the court erred in concluding that

---

11. In fact, the Cockses benefited, in part, from the 2016 resolution because the resolution declared that the Association would excuse the Cockses' own noncompliance with the RV restriction in the CC&Rs.

the Board violated the business judgment rule in adopting the 2016 resolution.[12]

### III. Waiver

¶40  Finally, the Association alleges errors in the district court's analysis of waiver.

¶41  The waiver issue arose when the Cockses argued to the district court that the Association had waived any right it may have had to enforce the CC&Rs to preclude the placement of RVs on their lots. In response, the district court explained that the Cockses always have been allowed to place RVs on their lots and could have "sold their property, for RV use, to someone outside their immediate family" but that the Association is "taking those rights away" under a "new interpretation of the CC&Rs." The district court then concluded that the Association "cannot now change horses in mid stream to deprive [the Cockses] of the full use of their property."

¶42  On appeal, the Association contends that the district court's waiver analysis was "legally incorrect" on the ground that the court's "rationale more closely followed an estoppel analysis" but that even then, the court "failed to apply the legal framework for estoppel." The Association also asserts that the court erred in failing to consider the Association's defense based on the CC&Rs' antiwaiver clause. The Cockses acknowledge that the district court "did not address the anti-waiver provision directly," but

---

12. Given that the 2016 resolution did not amend but, instead, simply interpreted the CC&Rs, if the court were to conclude on remand that the Board waived its right to enforce paragraph 1 of the CC&Rs against the Cockses, *see infra* ¶ 47, the scope of that waiver—not the 2016 resolution—would dictate whether the Association will be able to enforce the provision absent a change of use.

they maintain that the "evidence supported its finding that the right to exclude RVs and trailers was relinquished."[13]

¶43    "A party may establish waiver only where there is an intentional relinquishment of a known right." *Mounteer Enters., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, ¶ 17, 422 P.3d 809 (cleaned up). "Courts do not lightly consider a contract provision waived, however," *id.*, and "waiver is a highly fact-sensitive issue," *Chen v. Stewart*, 2004 UT 82, ¶ 81 n.14, 100 P.3d 1177, *abrogated on other grounds by State v. Nielsen*, 2014 UT 10, 326 P.3d 645.

¶44    Because we have concluded that, in this case, the CC&Rs unambiguously prohibit the placement of RVs on subdivision lots, the district court should revisit its analysis of the waiver arguments (including the antiwaiver clause of the CC&Rs), starting with the understanding that the CC&Rs disallow such placement. Further, we agree with the Association that the legal framework that the court employed on this subject was somewhat unclear, appearing to invoke estoppel principles rather than waiver.

¶45    The court first explained the Association's defensive argument—that because it had not "intentionally chosen not to enforce" the RV prohibition, it had not waived "its right to interpret the CC&Rs" as prohibiting RVs.[14] The court then

---

13. Relatedly, the Association also argues that the district court clearly erred in finding that the Association took no action to enforce "the RV prohibition." Because we are remanding this case for further proceedings and instructing the court to revisit the waiver issue and its findings, we do not resolve this argument.

14. As explained above, the position the Association took in the 2016 resolution was that it would not pursue enforcement action

(continued…)

explained that the Association's argument in this regard "comes too late" and that the Cockses "were entitled to rely upon the interpretation of the CC&Rs the association adopted prior to the adoption of the . . . 2016 resolution." By saying that the *argument* "comes too late," the court seemed to indicate that the Association had waived its *defense* to the Cockses' waiver argument. *See State v. Johnson*, 2017 UT 76, ¶ 16 n.4, 416 P.3d 443 (explaining that "waiver, in the context of raising an issue before a court, is generally the relinquishment or abandonment of an issue before a trial or appellate court" and may be "implied, such as by failing to raise an issue or argument at the required time" (cleaned up)). But the court's statement does not necessarily equate to a determination that the Association actually waived its legal right to enforce the CC&Rs and prohibit RVs.[15]

¶46 Additionally, by saying that the Cockses "were entitled to rely upon the [Association's previous] interpretation of the CC&Rs," the district court cited reliance as an important fact, thus implicating estoppel rather than waiver. *See Mounteer*, 2018 UT 23, ¶ 33 (comparing estoppel, which requires a showing that "another party was harmed by its reliance on the prior statement or act," with waiver, which does not require a showing of reliance or prejudice). The court further implicated estoppel in its conclusion that the "association cannot now change horses in mid stream to deprive [the Cockses] of the full use of their property."

¶47 Given the nature of the district court's discussion, we cannot say that it necessarily found that the Association waived

---

against lot owners who were currently using their lots for RVs. *See supra* ¶¶ 6, 36.

15. Moreover, the Cockses' argument was directed at the Association's right to enforce the CC&Rs; their argument was not that the Association had waived its defense to the Cockses' waiver argument.

the right to enforce the RV prohibition. Further, the court made no findings relevant to the Association's argument that it did not waive the antiwaiver clause.[16] Thus, we vacate the court's decision on waiver and remand this case for further proceedings. In so doing, we direct the court to revisit the issue in light of our reversal of its decision on ambiguity and to clarify the legal basis for its waiver analysis. We further direct the court to address the Association's argument based on the antiwaiver clause. The court's factual findings "should be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on *each* factual issue was reached." *Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 28, 70 P.3d 35 (cleaned up).

---

16. Generally, an antiwaiver provision "precludes parties from construing certain conduct as a waiver of contractual rights." *See Mounteer Enters., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, ¶ 19, 422 P.3d 809. "Antiwaiver provisions aim to give contracting parties flexibility in enforcing their rights under the contract . . . without resulting in a complete and unintended loss of [those] contract rights if [a party] later decides that strict performance is desirable." *Id.* (cleaned up). "So if the specific language of the antiwaiver clause expressly precludes parties from construing certain conduct as a waiver of contractual rights, courts must enforce this provision as part of the parties' agreement." *Id.*; *see also id.* ¶ 22 (explaining that an antiwaiver provision embodies "an agreement that specifically prohibits the mere failure to enforce a contractual right as being construed as waiver of that right"). However, "[e]ven an antiwaiver provision is subject to waiver." *Id.* ¶ 20. Thus, if a party asserting waiver in the face of an antiwaiver clause can establish "a clear intent to waive *both* the antiwaiver clause and the underlying contract provision," the court can conclude that the parties intended to modify their contract. *See id.* ¶ 21 (cleaned up).

CONCLUSION

¶48   Given the parties' agreement that RVs are "structures," the district court erred in determining that the CC&Rs are ambiguous about whether RVs are allowed in the subdivision. We therefore conclude that the CC&Rs unambiguously prohibit the placement of RVs on subdivision lots. Accordingly, we reverse the court's ambiguity determination; we reverse its determination that the 2016 resolution was arbitrary, capricious, and against public policy; we instruct the court to revisit the waiver issue; and we vacate its judgment and remand this matter for further proceedings consistent with this opinion.

———————

TENNEY, Judge (concurring):

¶49   I fully concur in the lead opinion. I write separately to emphasize one potential question that we are not answering.

¶50   In Point I, we conclude that the CC&Rs unambiguously prohibit homeowners from placing their RVs on lots in the subdivision. As we point out in paragraph 27, this conclusion turns on language from the CC&Rs that prohibits the placement of any "improvement or structure" that is not included in a defined list. As we then explain, the Cockses have not provided a plausible reading of the CC&Rs that would allow them to escape that list or, by extension, this prohibition.

¶51   But this all assumes that an RV qualifies as a "structure" in the first place. As we point out in paragraph 28, we're comfortable making that assumption because the Cockses have conceded that this is so for purposes of these CC&Rs.

¶52   That concession is critically important to my decision to join this opinion. "Utah courts have a long history of relying on

dictionary definitions to determine plain meaning." *Cook v. Department of Com.*, 2015 UT App 64, ¶ 13, 347 P.3d 5 (quotation simplified). In relevant part here, Merriam-Webster defines "structure" as "the action of building," or, relatedly, as "something (such as a building) that is constructed."[17] Merriam-Webster then defines "constructed" as "to make or form by combining or arranging parts or elements: BUILD," and it offers as an immediate example the phrase "construct a bridge."[18] Black's Law Dictionary gives a similar definition for "structure," defining it as "[a]ny construction, production, or piece of work artificially built up or composed of parts purposefully joined together" and then offering as an example the phrase "a building is a structure." *Structure*, Black's Law Dictionary (11th ed. 2019).

¶53 It's noteworthy that the word "structure" is commonly linked to the word "building." In this sense, the word "structure" seems to refer to a manufactured edifice that is in some sense fixed in place. But to state the obvious: an RV is not a "building," nor is an RV generally fixed in place. And for what it's worth, my intuitive sense of the word's ordinary usage suggests that an RV is not a "structure" either. If a motorist on the interstate looked over and saw an RV in the neighboring lane, I think that her passenger would be a little confused if the driver made a comment about the "structure" that was driving alongside them. After all, an RV is a vehicle, not a structure. To me, anyway, those seem to be different things.

¶54 Indeed, the CC&Rs in question seem consistent with this understanding. They state that "[n]o improvement or structure . . . may be erected, placed, or maintained" on any lot within the

17. https://www.merriam-webster.com/dictionary/structure [https://perma.cc/65KY-AD98] (definitions 1 and 2(a)).

18. https://www.merriam-webster.com/dictionary/constructed [https://perma.cc/596V-M2TK].

subdivision, and they then carve out from this definition "first class private dwelling house[s], patio walls, swimming pool[s], and customary outbuildings, garage[s], carport[s], servants' quarters, or guest house[s]." All of these things are buildings or building-adjacent features that are fixed to the ground (or, in the case of an above-ground swimming pool, essentially immovable for practical reasons). Given all this, I would have been receptive to the argument that a person could reasonably think that an RV is not a structure. And if that were so, this would have meant that this term is ambiguous with respect to how it's used in this key provision from these CC&Rs.

¶55 But while the Cockses hinted at such an argument in their brief, they had seemed to take something of a contrary tack below. This was perhaps unclear, though, so to pin things down, several members of this court asked the Cockses' counsel about this at the appellate oral argument. In response to those questions, the Cockses' counsel repeatedly told us that an RV does qualify as a structure. And while the Association's attorney initially suggested that an RV does not qualify as a structure in response to similar questions during his opening argument, he strategically saw the light by the time of rebuttal, now agreeing with the Cockses' counsel that an RV can be considered a structure for purposes of these CC&Rs.

¶56 The ultimate question in a contract case is what the parties meant with respect to the terms used in their contract. Because of this, "parties to a contract may define their terms as they please—a duck may be a goose," "up may be defined as down, right as left, day as night." *Penncro Assocs., Inc. v. Sprint Spectrum, LP*, 499 F.3d 1151, 1152, 1157 (10th Cir. 2007) (quotation simplified). True, courts will ordinarily "recognize and give effect to such private definitions only where the parties' intention to deviate from common usage is manifest," meaning that courts will usually look for some "textual indicia that the parties intended such a departure." *Id.* at 1157. But both parties to this contract are now

telling us that the term "structure" does indeed include an RV. So regardless of how we might ordinarily interpret this term, I think we have no choice but to take the parties' agreed-upon word for how to interpret this word for purposes of this case. At bare minimum, the Cockses have certainly waived the right to argue otherwise. And once it's locked down that an RV can qualify as a structure for purposes of these CC&Rs, the rest of our analysis in Point I about what is unambiguously prohibited by the CC&Rs naturally follows.

¶57    But even so, this case will of course set precedent that will be used as a common law guide for future cases. On the admittedly offhand chance that some future case arises that turns on whether the term "structure" can include a vehicle like an RV that can be driven across the country at high speeds, this opinion should not be read as settling that question in either direction as a matter of law. Rather, because our answer here starts with the parties' agreement that the term "structure" in this contract can include RVs, I regard the question about how to interpret the term "structure" elsewhere as remaining open.

————————